509 So.2d 671 (1987)
Chet K. WHATLEY, Plaintiff-Appellant,
v.
HARTFORD ACCIDENT & INDEMNITY CO., et al., Defendants-Appellees.
No. 86-529.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1987.
Writ Denied September 21, 1987.
*672 Howard N. Nugent, Alexandria, for plaintiff-appellant.
H. Gregory Walker, Jr., Percy Smith, Alexandria, for defendants-appellees.
Before DOMENGEAUX, DOUCET and KNOLL, JJ.
DOUCET, Judge.
Plaintiff, Chet K. Whatley, instituted this action seeking payment of worker's compensation benefits, medical expenses, attorney's fees, and penalties. Named as defendants were Justiss Oil Company, Inc. (Justiss), plaintiff's former employer, and Hartford Accident & Indemnity Company (Hartford). The trial court found that plaintiff failed to prove by a preponderance of the evidence that he was permanently totally disabled and rendered judgment in favor of defendants. Plaintiff has appealed.

FACTS
On October 16, 1984, plaintiff was working on an oil drilling rig in the course and scope of his employment with Justiss. The operator of the drilling rig made an error which resulted in parts of the rig falling, one of which struck plaintiff in his head causing him to lose consciousness and fall over a railing approximately fifteen feet to a platform below. Plaintiff was taken to the emergency room of a nearby hospital *673 and was subsequently hospitalized for observation and treatment.
Dr. Robert Kendrick, a family practitioner, examined the plaintiff and diagnosed him to be suffering from a concussion and cervical strain. He stated that the plaintiff complained of "a little discomfort" in his neck, shoulders and lower back. X-rays taken the day of the accident showed a normal curvature of plaintiff's lumbar spine and normal lumbosacral and sacroiliac joints. The X-ray report did state that a possible compression fracture of the L-1 disc would have to be ruled out since there was a questionable loss of volume of the body of L-1. The X-rays showed that plaintiff's cervical spine was normal except for a loss of the normal lordotic curve that the examining physician found was "probably secondary to muscle spasm." X-rays taken the next day of plaintiff's dorsal spine and right shoulder showed nothing abnormal.
At the time of his discharge from the hospital on October 20, 1984, Dr. Kendrick stated that plaintiff complained of feeling sore and also experienced headaches but was not in any severe pain or discomfort. He prescribed an anti-inflammatory drug and a muscle relaxant. At an examination on October 24, 1984, plaintiff complained of soreness in his neck, back, and shoulders. On October 31, 1984, plaintiff complained of headaches and, as Dr. Kendrick phrased it, "discomfort" in his left hip and lower back. Dr. Kendrick examined plaintiff on two more occasions and the complaints were the same. Dr. Kendrick performed some straight-leg and range of motion tests of plaintiff's hips and neck. He found nothing unusual in these tests other than a slight decrease in the range of motion in plaintiff's neck which had disappeared by November 14, 1984, the last examination. Because of plaintiff's continued complaints of pain, Dr. Kendrick referred him to an orthopedist, Dr. L. Donovan Perdue. At that time Dr. Kendrick felt that, in view of the lack of objective findings, plaintiff had a mild back strain.
Dr. Perdue examined the plaintiff on two occasions, November 14, 1984 and September 9, 1985, five weeks before the trial of this matter. Dr. Perdue stated that at the first examination plaintiff complained of a pulling type of discomfort in his left hip region upon bending and stooping. He had a full range of motion in his neck with some mild discomfort at the extreme ranges while cervical compression tests revealed no signs of nerve root irritation in the cervical spine. Plaintiff also complained of a pulling type of discomfort across his lower back at the extremes of bending and mild tenderness when Dr. Perdue applied heavy pressure to the lower lumbar region of his back. Dr. Perdue stated however, that sciatic stretch tests (straight-leg raising) did not indicate any nerve root irritation. Plaintiff had a normal range of motion in his hips, but experienced some pain or discomfort in his left hip when it was fully rotated. X-rays taken by Dr. Perdue showed a normal pelvis, lumbar spine, and normal hip and sacroiliac joints. Dr. Perdue diagnosed plaintiff as suffering from a strain of the back and left hip. He also characterized plaintiff's condition as chronic low back syndrome or strain. He prescribed an anti-inflammatory medication to alleviate discomfort and instructed plaintiff to perform some stretching exercises. He then released the plaintiff certifying him as able to return to work. He stated that there were no objective findings to explain plaintiff's complaints of pain. At his deposition he also stated that he felt plaintiff would not have benefitted from any diagnostic tests such as a myelogram, CAT scan, discography, or facet or nerve blocks because plaintiff did not have any indication of a ruptured disc. He admitted however that one possible explanation for the pain that radiated out of a person's lower back into his hips or extremities could be explained by the presence of a midline bulging disc.
After being discharged by Dr. Perdue on November 15, 1984, plaintiff was advised by a representative of Hartford that, based on Dr. Perdue's report certifying him as fit to return to work, the compensation benefits which he had been receiving since the accident, would be discontinued. Plaintiff testified that he continued to suffer from *674 pain and therefore did not return to work. In February 1985, he sought the advice of counsel who referred him to two physicians in New Orleans for examination, Drs. Bruce Razza and Masako Wakabayashi.
Dr. Bruce Razza, an orthopedic surgeon, first examined plaintiff on February 27, 1985. At that time plaintiff had some mild complaints of pain with extension and rotation of the neck with mild muscle spasm. Straight-leg raising on the left to 90 degrees aggravated plaintiff's back and left leg causing an increase in pain symptoms. Dr. Razza stated that this could represent some nerve root irritation. Straight-leg raising on the right to 90 degrees aggravated plaintiff's back only. The range of motion in plaintiff's spine was good with some complaints of pain. Plaintiff also complained of pain upon bending to the left side. Dr. Razza admitted that range of motion tests of plaintiff's neck, hips, and shoulders were within or approached normal limits. A sensory exam showed nothing abnormal; plaintiff's tendon reflexes were normal as was his muscle strength. Dr. Razza stated that there was evidence that the joints at the two lower lumbar levels were abnormally aligned, one side relative to the other. This was, Dr. Razza noted, a congenital abnormality which might, however, predispose an individual to experience abnormal stress on a disc when certain loads were applied to the spine.
Dr. Razza saw the plaintiff on two other occasions during the next two and one-half months at which times he found no significant changes in plaintiff's clinical condition. He also examined plaintiff on October 1, 1985, the morning of his deposition. Dr. Razza suspected that the plaintiff might have had either a torn or fissured disc, but not a herniation, that might be causing some intermittent irritation to the joints and to the nerve root of his lower back. He admitted that the plaintiff presented mostly subjective symptoms but that the objective findings were consistent with his diagnosis. He also stated that plaintiff's complaints had been consistent.
Dr. Wakabayashi, a radiologist, conducted a thermographic examination of the plaintiff on February 27, 1985 and again on October 1, 1985, the day of his deposition. He performed thermograms[1] on plaintiff's cervical and lumbar spine areas. The results of the thermograms taken in February and October were the same. They were interpreted by Dr. Wakabayashi to indicate muscle spasms in plaintiff's cervical and lumbar spine areas and irritability of the paravertebral muscles of the lower back, particularly the left side. Dr. Wakabayashi admitted that neither Tulane nor LSU schools of medicine offered coursework in the area of thermograms but both used it as a diagnostic tool. He also admitted that blood flow affects the temperature of the skin; that thermograms sometimes give false readings; and that you really don't know what is underneath the skin until you operate.
Dr. Ray J. Beurlot, Jr., an orthopedist who treated plaintiff in July 1984 for an earlier job-related cervical strain, stated that while not fully accepted, thermograms are useful as a non-invasive diagnostic aid.[2]
Dr. Perdue emphatically stated that there was no logical way that a thermogram could indicate muscle spasms. He didn't think that Dr. Wakabayashi's thermographic examinations added anything to plaintiff's diagnosis and stated that if thermograms are even "relevant", then the results of the examinations "would be about what you would expect in somebody with a back strain."
After receiving Dr. Wakabayashi's report, Dr. Razza recommended that plaintiff be given these further diagnostic tests: a CAT scan of the cervical and lumbar spine, *675 cervical and lumbar discographies, a left lumbar nerve block, and EMGs of the upper and lower extremities.
On March 22, 1985, copies of the reports[3] of both Dr. Razza and Dr. Wakabayashi were sent to the claims representative for the Hartford asking that plaintiff's worker's compensation benefits be brought up to date. Hartford did not respond and a second letter was mailed on April 15, 1985, specifically requesting authorization for the tests, compensation benefits, payment of Dr. Razza's bill, and reimbursement of plaintiff's travel expenses to New Orleans. A copy of Dr. Razza's report following his second examination of plaintiff was enclosed in this letter to Hartford. Hartford did not respond and on May 9, 1985, a third letter was mailed to Hartford. This letter purportedly contained a hospital admit form listing the requested tests together with a personal guaranty contract guaranteeing payment of the medical expenses related to the tests which Hartford was asked to return signed. Hartford failed to take any action. Meanwhile, a claim was filed with the Office of Worker's Compensation. The recommendation was rejected and this suit followed in June 1985.

DISABILITY
On appeal plaintiff asserts two assignments of error. He first contends that the trial court acted manifestly erroneously in giving the negative testimony of one expert witness more weight than the positive testimony of other experts. His basic argument is that the trial court was clearly wrong in finding that the plaintiff was not permanently and totally disabled.
LSA-R.S. 23:1221(2) sets forth the law applicable to payment of compensation benefits on the basis of permanent total disability and reads in pertinent part:
"(2) Permanent total.
(a) For any injury producing permanent total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, and experience, sixty-six and two-thirds percent of wages during the period of such disability.
(b) For purposes of Subparagraph (2)(a) of this Paragraph, compensation for permanent total disability shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain.
(c) For purposes of Subparagraph (2)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (2)(b) of this paragraph, compensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment."
Subparagraph 2(c) specifically applies to the facts of this case as plaintiff is not engaged in any employment or self-employment as described in Subparagraph 2(b).
Disability, or the absence thereof, is a finding of fact reached by the trial court and that finding will not be disturbed on review unless it is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
The testimony of Dr. Kendrick, taking into consideration that he is only a family practitioner, clearly indicates that it was *676 his opinion that plaintiff exhibited no objective reasons for plaintiff's complaints of pain. The substance of Dr. Perdue's testimony leaves no doubt that it was his opinion that plaintiff could not have been considered physically unable to engage in any employment or self-employment under the statutory standard. Dr. Razza's opinion that plaintiff would be unlikely to be able to perform any "gainful employment" was, he admitted, premised on plaintiff's subjective complaints of pain even though those complaints were consistent with his objective findings. The accuracy and therefore the probative value of Dr. Wakabayashi's thermograms might have been reasonably questioned by the trial court.
In reviewing the testimony of these medical experts plaintiff contends that the trial court should have given greater weight to positive findings of the medical experts rather than negative findings. Comeaux v. Cameron Offshore Services, Inc., 420 So.2d 1209 (La.App. 3rd Cir.1982). Plaintiff's assertion of error is based on the premise that the trial court did not follow this jurisprudential rule of law in evaluating the testimony of the experts. Even if we were to accept plaintiff's argument, we find that, viewing the medical evidence as a whole and giving greater weight to positive findings, plaintiff did not meet his burden of proof.
However, in addition to the testimony of medical experts, there was the uncontradicted testimony of plaintiff that he could not work because he was in pain twenty-four hours a day. Plaintiff contends that the trial court should have accepted as true his uncontradicted testimony absent a sound reason for rejection. In support of his position he cites the following cases: Johnson v. Insurance Company of North America, 454 So.2d 1113 (La.1984); Robertson v. Scanio Produce & Institutional Foods, Inc., 449 So.2d 459 (La.1984); West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979). The import of plaintiff's testimony was that he is in constant pain and that pain prevents him from working. Plaintiff clearly stated in a deposition that he would not take a job even if he was physically able to perform it and it would not aggravate his alleged back or neck problems. He confirmed this at trial, his reason being that he was in constant pain. There is no evidence that the trial judge refused to accept as true plaintiff's testimony that he was in constant pain. However, the trial judge apparently found a reason to determine that plaintiff was not physically unable to perform any employment or self-employment even though in pain. The law and evidence supports such a finding.
The legislature has made it clear that even if plaintiff is in pain, he must work unless he proves by clear and convincing evidence that he is physically unable to engage in any employment or self-employment as described in LSA-R.S. 23:1221(2)(c).
"Arguments that the employee is working in pain, or would have to work in pain, after his injury will have greatly reduced importance after the 1983 amendments. This was clearly the intendment of the amended provisions.
In a total and permanent disability argument, pain will now have no role to play at all. The fact that an employee can work but only in substantial pain will not make him totally disabled, since he must prove that there is no job he can do, even in "any" pain."
Malone & Johnson, Louisiana Civil Law TreatiseWorker's Compensation § 277 (Supp.1987).
After carefully reviewing the law and evidence, we are unable to say that the trial court was clearly wrong in finding that the plaintiff failed to meet his burden of proof and was therefore not entitled to compensation benefits based on permanent total disability.

ATTORNEY'S FEES AND PENALTIES
By plaintiff's second assignment of error, he contends that the trial court erred in failing to assess penalties and attorney's fees against defendants for failing to reinstitute weekly benefits, provide recommended medical care and/or testing, or refer *677 the plaintiff to another physician following receipt of Dr. Razza's report.
Compensation benefits for permanent total disability are due on the fourteenth day after the employer, or his insurer, receives knowledge of the injury and resulting loss of income. LSA-R.S. 23:1201 B. If any such benefits are not paid when due a penalty of twelve percent of the unpaid amount due shall be assessed against the employer or insurer and added to the unpaid amount due unless, (1) the nonpayment results from conditions over which the employer or insurer had no control; or (2) the employee's right to such compensation benefits has been reasonably controverted by the employer or his insurer. LSA-R.S. 23:1201 E.
Failure to pay a claim for benefits within sixty days after receipt of written notice and demand shall render the employer or his insurer liable for payment of all reasonable attorney's fees incurred in the prosecution and collection of such claim when the failure to pay is found to be arbitrary, capricious, or without probable cause. An employer or insurer who discontinues payment of benefits is likewise liable for payment of all reasonable attorney's fees similarly incurred if the discontinuance was arbitrary, capricious, or without probable cause. LSA-R.S. 23:1201.1.
We note that penalties "shall be added to " the amount of any unpaid benefits under LSA-R.S. 23:1201 E and that attorney's fees for the failure to pay or discontinuance of benefits are assessed for "the prosecution and collection of" such benefits under LSA-R.S. 23:1201.2. The law contemplates the award of penalties and attorney's fees only when the claimant prevails in his efforts to collect benefits. The trial court found, and we affirm his finding, that the plaintiff was not entitled to the claimed benefits. Therefore, penalties and attorney's fees could not have been awarded him based upon the discontinuance or failure to reinstate benefits to which he was not entitled. A finding that a claimant is not entitled to compensation benefits appears to logically preclude a finding that the discontinuance or failure to pay those benefits was arbitrary, capricious or without probable cause.
LSA-R.S. 23:1203 provides in pertinent part:
"A. In every case coming under this Chapter, the employer shall furnish all necessary medical, surgical, and hospital services, and medicines, or any nonmedical treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public, or private facilities as will provide the injured employee with such necessary services. All such services and treatment shall be performed at facilities within the state when available."
Pursuant to this statute, defendant(s) Justiss and/or its worker's compensation insurer, Hartford, were required to furnish medical treatment to the plaintiff following his accident.
The right to medical expenses under worker's compensation law is separate and distinct from the right to compensation and the employee may recover medical expenses even though there is no recovery for compensation. Young v. Hercules, Inc., 451 So.2d 109 (La.App. 3rd Cir.1984). The provisions of LSA-R.S. 23:1201 and R.S. 23:1201.2 providing for attorney's fees and penalties are applicable where an employee wrongly denies medical claims as well as compensation claims. Comeaux v. Cameron Offshore Services, Inc., supra; Scott v. Hartford Accident & Indemnity Co., 302 So.2d 641 (La.App. 3rd Cir.1974).
Plaintiff cites Comeaux v. Cameron Offshore Services, Inc., supra, as support for his contention that Hartford should have paid for his medical expenses incurred in visiting Dr. Razza and Dr. Wakabayashi as well as the tests recommended by Dr. Razza which were never performed.[4] The trial court did not address these issues in its reasons for judgment, apparently finding that the evidence did not show plaintiff was *678 entitled to payment of these expenses or any attorney's fees or penalties.
In Comeaux, supra, the plaintiff-employee injured his back while on the job and was diagnosed as suffering from a lumbosacral strain. Six weeks later he was certified as able to return to work. This opinion was confirmed by a second physician. Upon returning to work the plaintiff experienced a resurgence in back pain and was discharged. Due to his back problems, he was also discharged from a subsequent job. Approximately one year after his initial back injury, plaintiff consulted another physician who found a narrowed intervertebral disc space in his spine. That physician recommended that a myelogram be performed. The test was never performed due to plaintiff's financial inability to pay the expense himself and defendant's refusal to pay for it.
After the test was recommended, plaintiff's attorney arranged to have one of the physicians examine plaintiff who had previously certified him as able to return to work. That physician's opinion remained unchanged and no tests were ordered. The plaintiff subsequently filed suit for compensation benefits and attorney's fees and penalties. This court affirmed the trial court's finding that plaintiff was permanently totally disabled as well as its award of penalties and attorney's fees for the failure of the defendant to at least inquire further into the merit of plaintiff's claim before refusing to pay for additional medical treatment (the myelogram).
We do not find Comeaux, supra, controlling for several reasons. One important difference between the case before us and Comeaux, supra, is that X-rays of plaintiff's spine showed no narrowing of any of his intervertebral disc spaces. This fact was admitted by Dr. Razza and he explained the significance of this finding stating that, more often than not, when you have disc functional problems you have disc space narrowing on X-rays. The conservative treatments prescribed by Dr. Kendrick, Dr. Perdue, and Dr. Razza did not markedly differ other than in the types of medication prescribed. Dr. Perdue stated that even if the tests which Dr. Razza recommended showed a possible disc bulge, the prescribed treatment would not differ. Dr. Razza offered no evidence that the treatment would have differed if such a condition were found to exist. He stated that the tests would be useful if you were considering surgery, which would not be warranted in this case. Dr. Razza himself emphasized that he did not think plaintiff was suffering from a herniated disc which would require surgical intervention. Dr. Perdue went on to state that the tests might be useful from a legal standpoint in showing disability. It should be noted that plaintiff only visited Drs. Razza and Wakabayashi upon being sent to them by his attorney. It is well settled that an employer or insurer is not liable for a plaintiff's medical expenses incurred for litigation purposes. Langley v. Travelers Insurance Company, 159 So.2d 553 (La.App. 3rd Cir. 1964).
It is also worth noting that Dr. Razza ordered the additional tests performed only after receiving the thermographic report of Dr. Wakabayashi. Thermograms are controversial and their accuracy and reliability might reasonably be questioned.
Finally, no evidence was introduced showing the amount of the medical expenses owed for the examinations performed by Dr. Razza although Dr. Wakabayashi stated that each of his thermographic examinations cost $154.00.
After carefully considering the record evidence we are unable to say that the trial court erred in failing to award plaintiff these medical expenses, penalties, or attorney's fees.
For the assigned reasons we affirm the judgment of the trial court. Costs of this appeal are assessed against plaintiff-appellant.
AFFIRMED.
NOTES
[1] A thermogram measures the temperature of the skin. A liquid crystal thermogram unit is attached to the interested area and the crystals change color to reflect the skin temperature. Color photographs are taken of the liquid crystal readout and interpreted.
[2] Plaintiff was treated, released, and had returned to work before the October 16, 1984 accident. Dr. Beurlot stated that plaintiff had no complaints of back pain during his treatment of this cervical strain. He saw the plaintiff a total of eight times between July and October 4, 1984.
[3] Note: Copies of these reports were not filed in evidence.
[4] It is not disputed that all other medical expenses including plaintiff's hospitalization and treatment by Drs. Kendrick and Perdue have been paid by the defendant(s).