643 So.2d 352 (1994)
David GRAHAM, Plaintiff-Appellant,
v.
GEORGIA-PACIFIC CORPORATION, Defendant-Appellee.
No. 26165-CA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1994.
*354 C. Daniel Street, Monroe, for appellant.
Juge, Dwyer, Napolitano, Leyva and Guilbeau by Denis Paul Juge and Kristi L. Stroebel, New Orleans, for appellee.
Before SEXTON, NORRIS and HIGHTOWER, JJ.
NORRIS, Judge.
Both the claimant, David Graham, and his employer, Georgia-Pacific Corporation ("G-P"), appeal various aspects of a judgment rendered by the Office of Workers Compensation. For the reasons expressed, we amend the awards of temporary total benefits and supplemental earnings benefits ("SEB") to a rate based on Graham's wages before the second accident, and order the award of SEB to be continued after the date *355 of judgment, in accordance with law. In all other respects, however, we affirm.

Factual background
Graham was working as a laminator helper at G-P's box-making plant in West Monroe, earning $6.83 per hour. Graham is a large person, weighing in excess of 300 lbs. On September 25, 1989, he was stepping off a trolley at the plant when he slipped on some hydraulic grease. On his way down, he hit a piece of angle iron in the center of his back, below the belt line; he then landed flat on his back. He was promptly taken to Glenwood Medical Center, X-rayed and released; apparently he was not seriously hurt. After two weeks he returned to the plant on a light-duty basis, and by December he was again working as a laminator helper, putting in a lot of overtime as the demand for boxes was great.
On January 9, 1990, the laminator operator whom Graham had been assisting left him alone to run the line for a few minutes. Unfortunately, the load on the conveyor line backed up, slipped off and pinned Graham against a piece of metal tubing. Graham testified that he immediately sensed tingling and burning pain in his lower back and left leg. Because of the pain and alleged disability from this accident, he has not worked since. G-P began paying him temporary total benefits of $191.91 per week, effective February 5, 1990. G-P's personnel director also scheduled him to see Dr. Douglas Liles at the Orthopaedic Clinic of Monroe.
Over the next few months Graham underwent conservative treatment from Dr. Liles, who also referred him to Dr. Douglas Brown, an orthopedic surgeon (and Dr. Liles's partner). Dr. Brown advised against surgery until therapy was completed. In December 1990, G-P's rehabilitation contractor, General Rehabilitation Services ("GRS"), sent Graham to another orthopedist, Dr. Lewis Jones, in Shreveport. Dr. Jones found he was not a good candidate for surgery and, like the other doctors, recommended therapy. By May 1991, however, an MRI showed an extrusion at L3-4, leading Dr. Liles to recommend a percutaneous diskectomy. Later that month Dr. Brown recommended the same surgery, and Dr. Jones agreed. Dr. Brown performed the percutaneous diskectomy on July 5, 1991.
Graham testified that the surgery relieved his pain for a few days, but it soon began to recur. Dr. Brown verified this in September 1991, stating that a second surgery might be an option, a bilateral L3-4 laminectomy and diskectomy. He told Graham, however, that he could not authorize this without G-P's approval. He advised Graham to get a second opinion.
Dr. Jones re-examined Graham in October 1991, finding chronic lumbar radicular syndrome and chronic pain syndrome, but wrote that surgery "may not be the answer," as Graham did not show objective signs of pain and a more recent MRI was marginal. Later, Dr. Jones wrote that surgery would probably make Graham worse. Dr. David Adams, a physical medicine and rehabilitation practitioner, found no evidence of radiculopathy in Graham's legs. In early December 1991, on referral from GRS, Graham saw Dr. Phillip Osborne, an occupational medicine specialist, who ran a battery of tests. Testifying by deposition, Dr. Osborne found that Graham was able to do light, sedentary work, able to lift weights of 10 lbs. often, and 25 lbs. maximum. Simultaneously, however, Dr. Warren Long, a neurological surgeon whom Graham saw on Dr. Osborne's referral, wrote that Graham needed an MPRCT test and probably would need a microdiskectomy at L3-4. GRS again consulted with Dr. Osborne, who stated that Graham's odds of improvement by a second surgery were extremely poor. He recommended another independent exam, by Dr. Carl Goodman, an orthopedist and spine specialist. Dr. Goodman saw Graham in January 1992 and reported that he was a very poor candidate for further surgery; he recommended more therapy.
In February 1992, Dr. Osborne advised GRS that Graham had reached maximum medical improvement and was ready for light-duty work. Since this time, G-P has refused to pay for the laminectomy suggested by Dr. Brown. It also refused Graham's February 1992 request to be examined by *356 the neurosurgeon of his choice, Dr. Don Irby in Monroe.
On the strength of Dr. Osborne's and Dr. Goodman's reports, GRS performed labor market surveys to find jobs in the geographic area and within Graham's medical restrictions. According to Ms. Sims of GRS, this consisted of checking listings at Job Service, the state unemployment office, which provides only a job description and not the employer's name. After getting approval from Drs. Brown and Osborne, GRS sent a series of letters in March through June 1992 to Graham's attorney, advising him of 14 such jobs. Graham never applied for any of them. On the basis of Dr. Osborne's report and GRS's labor market survey, G-P reduced Graham's benefits to SEB of $71.91 per week effective July 26, 1992.
Prior to trial, G-P hired Mr. Louis Lipinski, a licensed vocational rehabilitation counselor. After reviewing Graham's medical records and work history, Mr. Lipinski conducted his own labor market survey by interviewing prospective employers. Through this process he developed a number of available jobs and sent this information to GRS; however, neither he nor GRS conveyed these leads to Graham until Mr. Lipinski testified at trial in May 1993.

Action of the hearing officer
The hearing officer addressed several issues in a long opinion. She first held, in a matter not contested on appeal, that G-P had failed to produce, within 30 days of the request, Dr. Osborne's medical report, pursuant to La.R.S. 23:1125. For this the hearing officer assessed the statutory $250 civil penalty and $300 in attorney fees.
Second, the hearing officer considered and accepted Graham's argument that he was not permitted to be examined, at the employer's expense, by the neurosurgeon of his choice, under R.S. 23:1121B. For this she ordered G-P to pay for the examination, and imposed attorney fees of $450 under R.S. 23:1201.2.
Third, the officer analyzed Graham's disability. She found the evidence "fully establishes" that he still suffers pain as a result of the work-related accident; and she noted the various jobs allegedly within Graham's restrictions that GRS had submitted. Although she found that most of these (including the highest-paying ones) were not readily available to Graham, the desk clerk position paying $4.25 per hour was available and within the restrictions; thus G-P was entitled to reduce Graham's benefits to SEB as of July 26, 1992. The officer further found that one skilled position located by Mr. Lipinski, as well as two unskilled positions, paying $4.50 and $4.25 per hour respectively, were readily available to Graham and within his restrictions. The officer therefore held that Graham could have worked any of these jobs from July 26, 1992 through the date of trial.
Fourth, the officer weighed the evidence in favor of the additional surgery, the laminectomy and diskectomy recommended by Dr. Brown. Dr. Brown did not actually say that surgery was the best course of action, but conceded that if Graham desired some relief from the continuing pain, this was the only option. Drs. Osborne, Jones and Goodman recommended against it. Dr. Long also suggested surgery, but a different procedure, a microdiskectomy. In light of this highly conflicting evidence, the officer refused to order G-P to pay for additional surgery. She noted, however, that on receipt of Dr. Irby's report, the situation could change.
Sixth, the officer calculated Graham's benefits based on his weekly wage for the four weeks preceding the first accident (in which his average monthly wage was $1,281.27). For the period of temporary total disability (February 5, 1990 through July 1992), the officer awarded Graham $198.65 per week. As G-P had actually paid him only $191.91 per week, Graham was entitled to the underpayment of $6.74 per week for 132 weeks. For the time after July 26, 1992, the officer reduced the monthly benefit by the SEB rate of $4.50 per hour for 40 hours a week, finding Graham entitled to SEB of $78.65 from July 1992 through the date of judgment (September 27, 1993). G-P had actually paid him $71.91 from July 27 through September 27, 1992, and owed him the underpayment of $6.74 per week for this period. Benefits are *357 apparently terminated after the date of judgment, without any explanation.
Finally, noting the nature of the dispute, the officer cited G-P's reliance on medical reports and its good-faith effort to pay weekly benefits; she therefore denied the claim for penalties and attorney fees (except those awarded for failure to produce Dr. Osborne's medical report and for wrongful denial of examination by the neurosurgeon of Graham's choice).
Judgment was rendered accordingly; its preamble recited that Graham "has been and continues to be entitled to SEB Benefits." Graham filed a devolutive appeal. He advances the following assignments of error:
(1) The hearing officer erred in failing to find Graham temporarily, totally disabled and entitled to weekly benefits for temporary, total disability.
(2) The hearing officer erred in failing to fix Graham's weekly benefits based on his earnings over the full four weeks before the second accident, instead of before the first accident.
(3) The hearing officer erred in failing to order G-P to provide the surgery needed by Graham.
(4) The hearing officer erred in failing to award substantial penalties and attorney fees for G-P's allegedly wrongful denial of surgery, underpayment and wrongful reduction and termination of benefits.
G-P later satisfied the judgment by paying Graham $6,821.15, which Graham accepted without prejudice to his appeal. G-P then answered the appeal, advancing the following assignments:
(1) The hearing officer erred in ordering G-P to pay SEB of $78.65 from September 28, 1992 (sic; correctly stated as July 1992 in brief) through the date of judgment.
(2) The hearing officer erred in ordering G-P to pay for an examination by the neurosurgeon of Graham's choice and in assessing attorney fees of $450 for this failure to authorize.

Applicable law
Compensation for temporary total disability is regulated by La.R.S. 23:1221(1). The statute provides, in pertinent part, that any injured employee who claims the benefits of temporary total disability and is not engaged in any employment or self-employment must prove,

by clear and convincing evidence, unaided by any presumption of disability, that he is physically unable to engage in any employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in pain, notwithstanding the location or availability of any such employment or self-employment.
R.S. 23:1221(1)(c) (emphasis added). See also Shelton v. Wall, 614 So.2d 828 (La.App. 2d Cir.1993).
The statute also provides for the termination of temporary total benefits:
An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made, and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required, or six months after the injury, whichever first occurs. * * *
R.S. 23:1221(1)(d) (emphasis added).[1]
For injuries that do not result in total disability, but rather leave the employee unable to earn 90% of his pre-injury wages, the statute authorizes SEB. These are based on the difference between the pre-injury wages and
average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or *358 not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience[.] * * *
[I]f the employee is not engaged in any employment or self-employment * * * or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment * * * which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or the employer's community or reasonable geographic region.

[I]f the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
R.S. 23:1221(3)(a), (c)(i) and (c)(ii) (emphasis added).
Once an SEB claimant establishes his prima facie case that his work-related injury rendered him unable to earn 90% of his pre-injury wages, the burden shifts to the employer to show that the claimant is physically capable of work and that work was offered or available in the reasonable geographic region; if the employer does so, the claimant must then show he is unable to perform employment offered or available solely as a consequence of substantial pain. Paul v. Gipson, 614 So.2d 1275 (La.App. 2d Cir. 1993), and citations therein.
The hearing officer's findings are subject to the same standard of review, manifest error, as a trial court's. Alexander v. Pellerin Marble & Granite, 630 So.2d 706 (La.1994); Key v. Insurance Co. of N. Amer., 605 So.2d 675 (La.App. 2d Cir.1992). Under this standard, the reviewing court does not ask whether the factfinder is right or wrong, but whether its conclusion was reasonable. Stobart v. State, through DOTD, 617 So.2d 880, 882 (La.1993). Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on credibility. Rosell v. ESCO, 549 So.2d 840, 844-845 (La. 1989). In the absence of such factors, however, the factfinder's decision to "credit the testimony of one of two or more witnesses * * * can virtually never be manifestly erroneous or plainly wrong." Id., at 845. The court of appeal shall render any judgment which is just, legal and proper upon the record on appeal. La.C.C.P. art. 2164.
In addition to weekly benefits for work-related accidents, the employer is also liable for all necessary medical and surgical treatment. R.S. 23:1203A. However, the claimant must prove that the expenses are reasonably necessary for treatment of the medical condition caused by the work-related injury. Whittington v. Rimcor, Inc., 601 So.2d 324 (La.App. 2d Cir.), writ denied, 605 So.2d 1366 (1992). Nevertheless, the claimant has the right to select one treating physician in any field or specialty. R.S. 23:1121B. The right to necessary medicals is separate and distinct from the right to compensation; the claimant may recover medical expenses even though he is no longer entitled to weekly compensation. Whatley v. Hartford Acc. & Indem. Co., 509 So.2d 671, 677 (La.App. 3d Cir.), writ denied, 512 So.2d 441 (1987).
The statute also requires the employer to pay benefits within 14 days of notice of injury and loss; failure to pay timely subjects the employer to a penalty of 12%, "unless such nonpayment results from conditions over which the employer or insurer had no control" or "the employee's right to such benefits has been reasonably controverted by the employer or his insurer." R.S. 23:1201E; Barton v. Wausau Ins. Co., 545 So.2d 1248, 1253 (La.App. 2d Cir.1989). Further, the employer is liable for reasonable attorney fees if it fails to pay benefits within 60 days of receipt of written notice and that failure is *359 found to be arbitrary, capricious, or without probable cause. R.S. 23:1201.2. The attorney fee provision is penal in nature and must be strictly construed, allowing recovery only in cases where the facts negate probable cause of nonpayment. Robichaux v. Terrebonne Parish Sch. Bd., 426 So.2d 241 (La. App. 1st Cir.1983). The hearing officer has great discretion in deciding whether to allow or disallow penalties and attorney fees. Barton v. Wausau Ins. Co., supra.

Discussion: Additional surgery
By his third assignment Graham urges the hearing officer erred in failing to order G-P to provide the surgery needed by Graham. In support he argues that in Dr. Brown's opinion, a fusion is necessary and, indeed, the only solution to Graham's continuing pain; and that Dr. Long also recommended surgery.
Standing alone, these doctors' recommendations may well have supported an order compelling G-P to provide some kind of surgery. However, Dr. Long obviously envisioned a more limited procedure, a microdiskectomy, and denied that Graham needed a fusion. Ex., 93. Dr. Brown's recommendation was not exactly ringing. He first observed that Graham's physical exam disclosed nothing that would recommend surgery. Ex., 282. He then stated, "if indeed his history was accurate and he was being truthful that he was having nerve root pressure and pain * * * essentially the only thing I could offer him was the surgery that I sort of outlined, the laminectomy and a fusion." Ex., 281. When Dr. Brown last saw Graham in October 1991, he was offering "the possibility of surgery with limited expectations[.]" Ex., 287.
The other medical opinions, however, undermined Dr. Brown's recommendation. Dr. Jones, reporting one month after Dr. Brown last saw Graham, stated, "I do not feel that if he had surgery at this time, that this would be successful, and would probably make him worse." R.p. 41 (emphasis added). Dr. Goodman, reporting two months later, stated that "this patient is a very poor candidate for further surgery in view of his complaints of back and leg pain and poor psychologic test results." Ex., 98. Dr. Osborne sent Graham for several tests over a two-day period in December 1991. Based on reports from his neurosurgeon, orthopedist and psychologist, he concluded that Graham was not a good surgical candidate. Ex. 22-23, 33.
Graham further argues in brief that the opinion of Dr. Brown, as the treating physician, should carry more weight than that of the doctors who advised against surgery, as they were secured only for evaluation. The treating physician's opinion is usually accorded more weight. See, e.g., Schouest v. J. Ray McDermott & Co., 411 So.2d 1042 (La.1982); Austin v. Howard Discount Stores, Inc., 569 So.2d 659 (La.App. 2d Cir.1990). However, the hearing officer should consider the totality of the evidence. Dr. Osborne conducted a series of comprehensive tests and submitted thorough reports. The hearing officer would not be wrong to attach significant weight to his findings. As we already noted, Dr. Brown's recommendation of surgery was somewhat equivocal and could thus have been unpersuasive to the hearing officer.
In light of the highly contradictory evidence, we cannot say the hearing officer was plainly wrong to find that Graham had not proved by a preponderance of the evidence that the fusion recommended by Dr. Brown was necessary. R.S. 23:1203A. Rosell v. ESCO, supra. This portion of the judgment is affirmed.

Disability
By his first assignment Graham urges the hearing officer erred in failing to find him temporarily totally disabled and entitled to weekly indemnity benefits for such disability. He argues that G-P refused to provide the surgery recommended by his treating physician, Dr. Brown, and has instead attempted to force Graham "to return to some form of employment simply to save worker's compensation expenses[.]" He further argues that until the claimant has reached maximum medical improvement, he is entitled to temporary total benefits. Ross v. St. Paul Fire & Marine Ins. Co., 556 So.2d *360 891 (La.App. 2d Cir.1990).[2] In support, he cites Dr. Brown's opinion that there was a "good chance" that he could return to his employment after the surgery. Much of Graham's argument here focuses on the denial of the laminectomy and fusion surgery suggested by Dr. Brown, but this is a point that we have considered separately in connection with Graham's third assignment.
The standard, of course, is whether the injury produced disability to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the claimant was customarily engaged when injured, and whether or not an occupation for which at the time of the injury he was particularly fitted by reason of education, training or experience. R.S. 23:1221(1)(a). Temporary total benefits are not available if the claimant can engage in any employment, including employment while working in pain. R.S. 23:1221(1)(b). The issue is factual. Graham himself testified that he could not work because of his lower back pain; however, he admitted he has good days and bad days. R. pp. 258, 254. He had to explain why he told Dr. Liles, a few months after the second accident, when his symptoms were not very different from what they are now, that he had been working refinishing bathtubs; he also did not deny that despite his complaints of disabling pain, he had been deer hunting 10 or so times. R. pp. 273, 274.
Dr. Brown recommended fusion solely on the basis of Graham's subjective complaints; he could make no physical findings that adequately explained the complaints. Ex., 282. Dr. Osborne, likewise, could make only minimal objective findings to support the complaints. Ex., 24. Even accepting those complaints, Dr. Osborne felt that, based on national standards, a person with Graham's problems could engage in light or sedentary employment, involving a maximum lift of 25 lbs., frequent lift of 10 lbs, sitting or standing for about one hour straight, infrequent bending, stooping, kneeling and squatting. Ex., 25. Based on these restrictions, G-P hired GRS (Ms. Sims) and Mr. Lipinski to locate jobs Graham could do.
Even with the complaints of pain that Dr. Brown accepted as genuine, he still felt that Graham was physically able to perform various jobs submitted by Ms. Sims: sales representative for motor vehicles and supplies, admitting officer in medical services, manager of food services, desk clerk, management trainee, and dispatcher. He rejected the positions of sales representative of food products, because this involved lifting up to 30 lbs., and of cashier/checker, as it involved lifting 15-20 lbs. Ex., 285. Dr. Osborne approved all these positions, including the two that Dr. Brown rejected. Ex., 27-28. Graham never applied for any of these jobs.
Later, at trial, Mr. Lipinski testified that he had studied the medical reports and sought out jobs within Graham's restrictions. He identified several qualifying skilled jobs with employers who had filled such positions in the last year: a warehouse worker at Monroe Bearing & Supply, a utility worker at Bocks Board Packing, and temporary jobs as headlight inspectors at Three/1 Tool & Die. He also identified unskilled jobs similar to those located by Ms. Sims; these usually require a brief period of on-the-job training. R. pp. 307-311.
The hearing officer found that Graham was able to do the desk clerk job identified by Ms. Sims, as well as the utility worker, desk clerk and counter clerk jobs located by Mr. Lipinski. These jobs represent any occupation for wages, were approved by Graham's treating and evaluating physicians as within his physical restrictions, and were available to him by July 1992. R.S. 23:1221(1)(a). On the evidence presented, the hearing officer could reasonably find that Graham did not prove, by clear and convincing evidence, that he could not perform these jobs. The fact that he felt he would have been in pain at *361 these jobs is irrelevant under the definition of temporary total disability. R.S. 23:1221(1)(b). Moreover, the record supports the finding that apart from surgery, Graham had reached the point that "continued, regular treatment by a physician is not required." R.S. 23:1221(1)(d). On this record, we perceive no manifest error in the hearing officer's denial of benefits for temporary, total disability. Rosell v. ESCO, supra. This aspect of the judgment is affirmed.

Supplemental earnings benefits
By its first assignment G-P urges the hearing officer erred in awarding Graham SEB of $78.65 per week from July 1992 through the date of trial. G-P correctly concedes that a claimant who is released for light-duty work and no longer eligible for temporary total benefits may be entitled to SEB. Gibson v. Boh Brothers Const. Co., 513 So.2d 403, 405 (La.App. 4th Cir.1987); Ross v. St. Paul Fire & Marine Ins. Co., supra.
Factually, G-P reiterates that Dr. Brown approved various jobs (dispatcher, management trainee, desk clerk, food service manager, admitting officer, and motor vehicle sales representative) in mid-June 1992, and on this basis G-P reduced Graham's benefits to SEB on July 26. G-P further asserts that Dr. Osborne approved all of these jobs and two more (cashier/checker and sales representative) on August 31, 1992, and on this basis G-P terminated Graham's SEB on September 27. G-P argues that it met the burden of proof stated in R.S. 23:1221(3)(c)(i) by proving that these jobs were available to Graham in his or G-P's reasonable geographic region. In support, it cites Batiste v. Hopeman Brothers, Inc., 508 So.2d 922 (La. App. 4th Cir.), writ denied, 512 So.2d 1178 (1987). It further argues that the average weekly wage of all the approved, available jobs was $270.00, which exceeded 90% of his pre-injury wage and thus eliminated the need for SEB.
Of the jobs located by Ms. Sims and approved by Dr. Brown, the hearing officer found that only one, the desk clerk paying $4.25 per hour, was actually within Graham's capacity, generally available to him or a sufficient source of steady income. Ms. Sims specifically testified that two of the jobs she located, management trainee and sales representative for motor vehicles and supplies, were developed from Job Service listings; she did not speak to the employer to see if the job was actually available. Ex., 175-179. She also testified that, in general, she did not speak with prospective employers, except for the manager at Wal-Mart (none of whose jobs were approved by Dr. Brown) and the desk clerk employer. Ex., 179-180, 183. This situation may have cast doubt, in the hearing officer's mind, as to whether those jobs were really still available. The record provides a reasonable basis for the hearing officer's finding that only the desk clerk job was really available.
Further, Ms. Sims testified she never personally met with Graham, but she was influenced by another counselor's observation that he ambulated better than a person in pain. Ex., 166-167. In Batiste v. Hopeman Brothers, Inc., supra, the court held that the employer need only show that the jobs are generally available (in fact, a labor market survey is not required). 508 So.2d at 923. However, the court also acknowledged that the expert who testifies must take into account jobs of the type that the claimant could "realistically and likely secure" (citing New Orleans (Gulfwide) Stevedores v. Turner, 661 F.2d 1031 (5th Cir.1981)). The hearing officer apparently felt that on the evidence presentedespecially Graham's low achievement test scores and his large, ungainly sizeGraham could not realistically and likely secure the other, higher-paying positions identified by Ms. Sims. Under the circumstances, we cannot declare this plainly wrong.
Mr. Lipinski's labor market search was better than Ms. Sims's, as he personally contacted the prospective employers. R.p. 303. He testified that he got his assignment in the last week of April 1993. The hearing officer determined that of the jobs he located, three were actually available and within Graham's capacity. G-P urges in brief that it met the burden of proving that more of the jobs located by Mr. Lipinski, including the higher-paying ones, were available and within Graham's *362 capacity. However, the record is clear that Mr. Lipinski sent the results of his search only to GRS, not to Graham. R.p. 313. Ms. Sims did not testify that she conveyed the survey to Graham; in fact, she gave her deposition before Mr. Lipinski received the assignment. On these facts, the hearing officer was entitled to find that Graham simply did not know about the additional jobs until he heard Mr. Lipinski testify in May 1993. The officer was also entitled to find that these jobs were indeed within Graham's restrictions and available to him under R.S. 23:1221(3)(c)(i). Rosell v. ESCO, supra.
The record further shows that none of the three jobs that the hearing officer considered to be within Graham's capacity and actually available paid 90% of his pre-injury wage. Nevertheless, the hearing officer without explanation terminated Graham's SEB on the date of judgment. On the record as it currently stands, we cannot find any factual basis for this; in fact, the judgment itself is inconsistent, reciting that Graham "has been and continues to be entitled to SEB Benefits." Graham has not specifically urged the termination of SEB as error; however, SEB are in essence a lesser included element of temporary total benefits. See Ross v. St. Paul Fire & Marine, 556 So.2d at 897-898, citing Jacks v. Banister Pipelines America, 418 So.2d 524, 527 (La.1982). Graham did in fact contest the denial of temporary total benefits. In light of the fact that art. 2164 authorizes this court to render judgment that does substantial justice, that there is no evidence to support the hearing officer's unexplained termination of benefits, and that further proceedings will perhaps be conducted on receipt of the neurosurgeon's report, we will amend the judgment to continue Graham on SEB in accord with R.S. 23:1221(3)(d), or until G-P proves that continued benefits are no longer warranted.
In sum, the hearing officer was not plainly wrong to find Graham entitled to SEB from July 27, 1992 through September 29, 1993. This portion of the judgment is affirmed. The hearing officer was plainly wrong to stop benefits after September 29, 1993; this portion of the judgment is amended.

Examination by neurosurgeon
By its second assignment G-P urges the hearing officer erred in ordering G-P to pay for an examination by the neurosurgeon of Graham's choice and in assessing attorney fees and penalties of $450 for this failure to authorize. The thrust of the argument is that the claimant is entitled only to necessary medical expenses under R.S. 23:1203A, and that neither of Graham's treating physicians, Dr. Liles or Dr. Brown, ever testified that this additional examination was necessary.
The statute, R.S. 23:1121B, provides that the claimant "shall have the right to select one treating physician in any field or specialty." This statute does not say that the claimant's selection must be approved by the employer's physician, or deemed necessary by that physician. We note that after the accident of January 9, 1990, G-P arranged for Graham to see Dr. Liles, who later referred him to Dr. Brown. Graham did not object to either of these selections, but they were not physicians of his choosing. Later examinations by Drs. Jones, Osborne, Adams and Goodman were definitely at G-P's direction. In December 1991 Dr. Brown referred Graham to Dr. Beach, a neurosurgeon in Shreveport, but Graham never actually saw him. In February 1992 Graham requested an examination by Dr. Irby, a neurosurgeon in Monroe; this was denied.
Section 1121B makes it clear that Graham was entitled to receive an examination by the neurosurgeon of his choice; this was only fair after he submitted to tests by G-P's neurosurgeon. While Drs. Liles and Brown did not say an additional examination was necessary, there was nevertheless great divergence of opinion as to whether Graham needed additional surgery. Under such circumstances, the hearing officer must have the discretion to order additional tests. See Johnson v. Coppage, 360 So.2d 275 (La.App. 4th Cir.1978), fn. 1. On the record presented, we see no abuse of discretion. This portion of the judgment is affirmed.

Basis of compensation
By his second assignment Graham urges the hearing officer erred in failing to base his *363 weekly compensation benefits on the four weeks before the second accident, January 9, 1990, rather than the four weeks before the first accident, September 25, 1989. In support, he cites the statutory definition of accident in R.S. 23:1021(1):
"Accident" means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
Graham correctly asserts that wages for purposes of figuring compensation are based on the full four weeks preceding the date of the accident. R.S. 23:1021(10)(a)(i). Overtime wages are included in the calculation. Brown v. Manville Products Corp., 565 So.2d 496 (La.App. 2d Cir.), writ denied, 567 So.2d 1127 (1990). Graham's wages for the four weeks before the first accident averaged $299.47 per week; his wages for the four weeks before the second accident, $324.64 per week. The thrust of Graham's argument is that the second accident, not the first, actually disabled him, and should form the basis of his compensation.
G-P argues that Graham had not reached maximum medical improvement after the first accident when the second accident occurred, and that for this reason the wages preceding the first accident were properly applied. In support, it cites Bonnette v. Travelers Ins. Co., 367 So.2d 1261 (La.App. 3d Cir.1979), for the notion that wages under the statute mean those received at the time of the accident, not some later time. G-P concedes, however, that the instant case presents a "unique" situation.
We note that in her opinion the hearing officer figured Graham's compensation amount without any explanation of whether the second accident might apply. While we are unaware of any prior cases precisely on point, the jurisprudence has long considered an accident to be an event that causes injury or disability. Sparks v. Tulane Med. Center, 546 So.2d 138 (La.1989). For this reason, when an accident aggravates or accelerates a pre-existing condition, the accident is compensable. See, e.g., Robinson v. Travelers Ins. Co., 619 So.2d 1261 (La. App. 3d Cir.1993), and citations therein.
Here Dr. Liles reported that Graham's original fall in September 1989 most likely precipitated his back rupture, but the second fall in January 1990 aggravated it. Ex., 407. Graham testified that the first accident made him miss about two weeks of work but he was then able to resume light-duty work; G-P paid him no weekly benefits and did not dispute that he was back at the plant soon after the accident. By contrast, the second accident immediately produced the symptoms, tingling and burning in the lower back and left leg, that necessitated the operation in July 1990 and caused him to claim disability. Under the circumstances, it was plainly wrong for the hearing officer not to consider and find that Graham's second accident caused the period of disability. Graham was entitled to two-thirds of his wage of $324.64 per week, or $216.43, subject to credit for amounts already paid in weekly benefits and paid pursuant to the hearing officer's judgment. The difference is $17.78 per week for weeks in which G-P paid weekly temporary total benefits and SEB; and the total SEB award is $96.43 per week for weeks in which G-P did not pay SEB.
This portion of the judgment will be amended accordingly.

Penalties and attorney fees
By his fourth assignment Graham urges the hearing officer erred in failing to assess substantial penalties and attorney fees for G-P's "wrongful denial of the surgery, underpayment, wrongful reduction and termination of benefits and failure to reinstate same." Reiterating the facts, Graham argues "it is hard to imagine more callous and arbitrary conduct than that exhibited by the defendant-appellee in this case." Br., 16.
The claim for attorney fees is allowed only if the employer or insurer's failure to pay is arbitrary, capricious or without probable cause. R.S. 23:1201.2. Because this provision is penal in nature it is narrowly construed. Robichaux v. Terrebonne Parish *364 Sch. Bd., supra. Our review of this case has affirmed the majority of G-P's acts, including its denial of fusion surgery and reduction of benefits to SEB. The hearing officer was not plainly wrong to find G-P not arbitrary, capricious or without probable cause. The officer cited the highly contradictory medical evidence and found that G-P's action was insufficient to provoke the imposition of attorney fees. On the record presented, this is not manifest error.
As for the claim of statutory penalties of 12%, this court has concluded that G-P and the hearing officer erred in basing Graham's benefits on his wage before the first accident instead of the second. The ultimate outcome was not clearly directed by the statute or the jurisprudence. We conclude that G-P reasonably relied on what it considered to be the applicable law, Bonnette v. Travelers Ins. Co. Although it did not prevail, G-P reasonably controverted Graham's claim and should not be held to the statutory penalties under the circumstances presented. This portion of the judgment is affirmed.

Conclusion
For the reasons expressed, the judgment of the hearing officer is affirmed in all respects, except for the third and fourth paragraphs, which are amended as follows:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant is liable to the plaintiff for underpayment of temporary, total weekly benefits in the amount of $24.52 per week, from January 9, 1990 until July 26, 1992, subject to credit for any amounts already paid for this period.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant is liable to the plaintiff for underpayment of Supplemental Earnings Benefits in the amount of $24.52 per week from July 27, 1992 until September 27, 1992; and for Supplemental Earnings Benefits in the amount of $96.43 per week, for failure to pay same, from September 28, 1992 until they are no longer necessary, in accordance with R.S. 23:1221(3), subject to credit for any amounts already paid for this period.
Costs of appeal are assessed to Georgia-Pacific Corporation.
AMENDED AND AFFIRMED.
NOTES
[1] At the time of Graham's first injury, this subsection was designated as § 1221(1)(b). La.Acts 1988, No. 938, effective January 1, 1989. The passage was redesignated as § 1221(1)(d) (and the six-month provision added) by La.Acts 1989, No. 454, effective January 1, 1990.
[2] The accident in Ross occurred in 1984, when the statute allowed for temporary total disability benefits "during the period of such disability"; we construed this as meaning until maximum medical improvement. However, since the 1988 amendment, recovery under this subsection is allowed only until "the point that continued, regular treatment by a physician is not required[.]" La. Acts 1988, No. 938, effective January 1, 1989. Maximum medical improvement is no longer the standard.