CARAWAY, J.
11 This workers’ compensation dispute is based on the alleged aggravation of claimant’s preexisting condition while working in the course and: scope of his employment on October 3, 2012. . -The work-related incident reported by plaintiff on that date, was not détermined by the Workers’ Compensation Judge (“WCJ”) to "amount to an accident, instead, the WCJ" determined that this incident merely involved á continuation'of claimant’s ongoing painful condition and was not an aggravation caused by the accident. From our review of the record, finding no manifest error, we" affirm.

Facts

Harold Garrett (“Garrett”) worked for Calumet GP, LLC (“Calumet”), an oil refinery, since 1992. Garrett stopped working in March of 2012 because of increasing low back pain and did not return to work until July of 2012. There was no assertion of a work-related injury pertaining to his back condition during that period.[1]
On October 3, 2012,'while working in the course and scope of his employment as a blender and loader-of railcars, Garrett said that he felt a sudden pain in his lower back and leg while he was crouching down under a railcar to hook up a hose. Although no one witnessed this incident, a coworker and personal friend, Terry Sanders (“Sanders”), appeared afterwards and helped Garrett get up from under the rail-car. Thereafter, |aCalumet treated the incident as a work accident and began extending workers’ compensátion benefits to Garrett .through its workers’ compensation insurer, Ace American Insurance Co. (“Ace Insurance”).[2]
On' November 18, 2013, the claims adjuster for Ace Insurance, Cody Hubbard *715 (“Hubbard”), had a telephone conversation with Garrett. Hubbard wanted to know why, after a year, Garrett still could not return to work. Garrett told Hubbard that he is not able to work, and that his quality of life is diminished. He reported that he walks with a limp and uses a walker, does not go anywhere with his friends, and cannot enjoy his life. Garrett claimed that he has difficulty making the bed and indicated he would discuss social security disability with his doctor and ask about surgery.
Subsequently, Hubbard requested surveillance on Garrett and received a first report on December 2, 2013.[3] Hubbard called Garrett that same day and Garrett told him that he was still using a walker to get around due to the pain. He also stated that the pain- was causing him to request a new epidural steroid injection and that he was unable to return to work in any capacity. Hubbard decided to terminate Garrett’s benefits on December 3, 2013, after concluding from the surveillance that Garrett’s statements to him were false.
|sOn December 19, 2013, Calumet filed a disputed claim for compensation, asserting that Garrett could not establish an accident with injury in the course and arising out of his employment and in the alternative, that Garrett violated La. R.S. 23:1208 by making material misrepresentations with regard to his physical abilities.
On January 4, 2014, Garrett made a reconventional demand against Calumet averring that he was entitled to indemnity benefits, medical treatment, medical mileage, penalties and attorney fees. Garrett also asserted an exception of vagueness, arguing that Calumet failed to inform him of the false statements he made pursuant to Calumet’s La. R.S. 23:1208 allegation. Eventually, Garrett made Ace Insurance an additional defendant.
The matter was tried on October 4, 2014. After considering the evidence, the applicablé law, and the argument for counsel, the WCJ gave written reasons for judgment on December 14, 2014. The court concluded that Garrett failed to prove a “compensable accident” as defined under the Workers’ Compensation Act, because the October 3 incident was merely a continuation of Garrett’s ongoing symptoms. The court also concluded that Garrett did not commit fraud and thus declined to assess civil penalties and/or restitution under La, R.S. 23:1208.
It is from this ruling that Garrett appeals. ■

Discussion

In a workers’ compensation case, the appropriate standard of review to be applied by the appellate court to the WCJ’s finding of fact is the manifest error or clearly wrong standard. Dean v. Southmark Const., 03-1051 (La.7/6/04), 879 So.2d 112; Dunlap v. Madison Parish Sch. Bd., 46,189 (La.App.2d Cir.4/13/11), 61 So.3d 833. Whether the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the WCJ. Dunlap; supra; Harris v. Casino Magic, 38,137 (La.App.2d Cir.1/28/04), 865 So.2d 301, writ denied, 04-0502 (La.4/8/04), 870 So.2d 275. Unless shown to be clearly wrong, the WCJ’s factual findings of a work-related disability will not be disturbed where there is evi *716 dence which, upon the trier of fact’s reasonable evaluation of credibility, furnishes a reasonable, factual basis for those findings. - Id. When a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Wilson v. General Motors Corp., 45,232 (La.App.2d Cir.5/26/10), 37 So.3d 602. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell, supra, Morgan v. Glazers Wholesale Drug Co., 46,692 (La.App.2d Cir.11/2/11), 79 So.3d 417. The trier of fact’s determinations as to whether the worker’s testimony is credible and whether the worker discharged the burden of proof are factual determinations, not to be disturbed upon review unless clearly wrong. Harris v. City of Bastrop, 49,534 (La.App.2d Cir.1/14/15), 161 So.3d 948; Thomas v. GM Benefits & Serv. Ctr., 48,718 (La.App.2d Cir.1/15/14), 132 So.3d 464.
IsAn employee is entitled to worker’s compensation benefits if he receives a personal injury by accident arising/out of and in the course of his employment. La. R.S. 23:1031; McLin v. Industrial Specialty Contractors, Inc., 02-1539 (La.7/2/03), 851 So.2d 1135; Scott v. Super 1 Foods, 45,636 (La.App.2d Cir.9/29/10), 48 So.3d 1133. An employment-related accident is an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or, without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration. La, R.S. 23:1021(1). The term “accident” includes a weakened condition which collapses due to a precipitous event. Rice v. AT & T, 614 So.2d 358 (La.App. 2d Cir.1993).
Although the workers’ compensation law is liberally construed in favor of coverage, the claimant’s burden of proving an accident is not relaxed; she must prove by a preponderance of the evidence that an accident occurred and the resulting disability is related’ to an on-the-job injury. McLin, supra; Hofler v. J.P. Morgan Chase Bank, N.A., 46,047 (La.App.2d Cir.1/26/11), 57 So.3d 1128, 1134. When the accident at question is unwitnessed, a worker’s testimony alone may be sufficient to discharge claimant’s burden of proof, provided two elements are satisfied:- (1) no other evidence discredits’ or casts doubts upon the worker’s version of the incident; and (2) the worker’s testimony is corroborated by the -circumstances following the alleged incident. Bruno v. Harbert Int’l, Inc., 593 So.2d 357, 360-61 (La.1992).
|rA preexisting medical condition will not bar an employee from recovery if the employee establishes that the work-related accident aggravated, acceler-atéd or combined with the condition to cause the disability for which compensation is cláimed. Peveto v. WHC Contractors, 93-1402 (La.1/14/94), 630 So.2d 689; Hatfield v. Amethyst Const., Inc., 43,588 (La.App.2d Cir.12/3/08), 999 So.2d 133, writ denied, 08-2996 (La.2/13/09), 999 So.2d 1150. The preexisting condition is presumed to have been aggravated by the accident if the employee proves: (1) the disabling symptoms did not exist before the accident, (2) commencing with the accident, the disabling symptoms appeared and manifested themselves thereafter, and (3) either medical or circumstantial evidence indicates a reasonable possibility of causal connection between the accident and the activation of the disabling condition. Peveto, supra.
*717 In his only assignment of error, Garrett argues that the trial- court erred by ruling that he failed to prove a compen-sable accident. Garrett avers that this court faced with similar facts in Rice, supra, held that the claimant did prove a compensable accident.
In Rice, the claimant injured her back while working on the assembly line at AT & T installing parts in cable telephones. Rice, supra at 359. Based on an MRI examination, claimant’s physician was of the opinion that this incident caused claimant to reinjure herself or suffer a second injury. Id. The physician opined that the injury stemmed from a preexisting degenerative spinal condition that had plagued claimant for years. Id. The trial court accepted this as fact, and originally held in favor of claimant. Id. ] ./Thereafter, the trial court granted defendant’s motion for a new trial, rescinded its previous judgment and issued a second judgment in favor of plaintiff. Id. On appeal, this court stated:
Thus, the issue ultimately becomes whether the legislature, through the 1989 amendment, where a degenerative condition is involved, intended to provide compensation only for an accident caused by an extraordinary exertion, over and above the routine, tasks of employment, or whether it also intended to include compensation for an incident such as the instant one where a relatively minor occurrence produced an objective indication of injury.
Id. at 360. The court concluded that a claimant could establish a compensable accident “where a worker suffers ■ from a gradually deteriorating or progressively degenerative condition,” “and that the legislature did not intend to limit the definition of accident to only extraordinary exertion.” Id.
Garrett testified that the week after he returned to work in July of 2012, he had aches in- the morning that forced him to do McKenzie exercises and take an aspirin. These symptoms only lasted a- week and after the symptoms ceased, he only had minor pain in his lower back that did not radiate down the leg. He stated that up until the October 3 incident, he did not report his physical problems or symptoms to anyone.
Michael Rhodes stated that he is the safety environmental manager for Calumet. Rhodes spoke with Garrett immediately after the October 3 incident. After Garrett was evaluated at the company clinic, Rhodes had a 15-20 minute conversation while Garrett was being driven back to his vehicle. Rhodes testified that Garrett told him. “that after about a month after returning to work that he started to have pain, and the pain just 18continued to the point where he just couldn’t take it anymore.” Rhodes felt “that comment struck [him] as not.fitting in with the night’s events. And the night’s events being that everything was-fine, and then we suddenly had an accident underneath the railcar.” Rhodes documented this conversation in an email.
Sanders stated that prior to his retirement, he worked with Garrett, including between July 2012 and October 3, 2012. He considers Garrett to be a friend. On the October 3 date, he found Garrett under a railcar and he helped him up. He wasn’t there to witness the event because “the supervisor called and wanted [him or Garrett] to go over there and hook up or get a pump ready- for maintenance!’ Sanders testified that between Garrett’s return to work and the October 3 date, he observed that Garrett was in pain even when Garrett would sit down and do' paperwork. He stated that Garrett told him that most of the pain was in his back and he would *718 “grab his leg a lot of times and then have to stand up because he couldn’t sit down a whole lot.” He averred that Garrett-was in pain of most the time, even when he was “changing his clothes and stuff.”
David Cavanaugh, M.D, (“Dr. Cava-naugh”), a neurosurgeon whose surgical expertise includes operating upon the lumbar spine and the cervical spine, stated in his deposition that he first began treating Garrett in 2009. Garrett had been complaining of neck pain and Dr. Cavanaugh’s examination of Garrett revealed evidence of C5 and C7 radiculopathy. On April 15, 2009, Dr. Cavanaugh performed neck surgery and Garrett responded well, reporting no neck pain thereafter.
|nDr. Cavanaugh did not treat Garrett again until 2012 when Garrett began complaining of severe pain in his lower back and leg. Dr. Cavanaugh reviewed a lumbar MRI study performed on Garrett on March 26, 2012. Dr. Cavanaugh felt that the study revealed that Garrett “certainly had changes, looked like post surgical changes, on the right side at L5-S1, possibly the L4-5; multi-level degenerative changes; some foraminal narrowing, but did not feel like he had any central spinal canal stenosis; degenerative facet joint changes.” Thereafter, Dr. Cavanaugh recommended an EMG study, which he stated is a function or physiological test. An EMG was performed on April .4, 2012 and April 23, 2012. The studies were suggestive of left L2-3, L4, and L5 radiculopa-thies.[4] . Dr. Cavanaugh determined that Garrett had low back pain with disc bulge at 1j3 — 4 and recommended an L3 selective nerve block, which was performed on April 27, 2012.
On May 3, 2012, Garrett had a CT scan of-his lumbar spine, which Dr. Cavanaugh concluded “show[ed] multi-level degenerative changes, multi-level bilateral foraminal or nerve root opening.” On July 3, 2012, Dr. Cavanaugh released Garrett to return to full duty, despite Garrett’s job requirements. Dr. Cavanaugh examined Garrett on October 9, 2012, after the alleged accident. Based on this' examination and an EMG performed on- October 23, 2012, Dr. Cavanaugh concluded that there was no objective evidence that Garrett’s preexisting condition had been aggravated.
| iqAustin W. Gleason, M.D. (“Dr. Gleason”), an orthopedic specialist in the. nonsurgical treatment of spine disorders and occupational medicine, stated in his deposition that, he first saw Garrett on July 13, 2012. When prompted by counsel for ap-pellees, Dr. Gleason conceded that the “pre-accident” EMG studies were abnormal, but the “post-accident” EMG studies were normal. Also, he stated he had no reason to doubt the conclusion of Curtis Partington (“Dr. Partington”), a neurora-diologist.[5] Dr. Gleason reviewed the finding of Dr. Partington as follows. Dr. Part-ington reviewed the MRI from March 26, 2012, the myélogam' from May 3, 2012; and the MRI from May 8, 2013. Dr. Part-ington concluded that “[t]here has been no change in the appearance of the spine since the previous studies '... there has been no detrimental change in the appearance of the spine to suggest the presence of superimposed traumatic injury.” Dr. Gleason examined Garrett on November 12, 2012, November 30, 2012, December 20, 2012, February 18, 2013, April 4, 2013, April 25, 2013, May 8, 2013, and June 26, *719 2013. On each of these dates, Dr. Gleason testified that other then Garrett’s pain complaints, there was nothing abnormal. He cleared Garrett to return to work on June 26, 2013 to light-medium physical demand.
David N. Adams, M.D. (“Dr. Adams”), a board certified physician in the field of electrodiagnostic medicine, performed an EMG on Garrett on April 4, 2012 (pre-accident) and October 23, 2012 (post-accident). Based on, the April study, Dr. Adams’ impression was that the “[ejlectro-diagnostic | ^findings are suggestive of left L2/3, L4 and L5 radiculopathies.” By contrast, Dr. Adams’ impression of the October study was that there was “[n]o elec-trodiagnostic evidence of radiculopathy, neuropathy or myopathy found in both extremities.” In his summary of this study, Dr. Adams concluded that “[t]he electro-diagnostic findings suggestive of left L2/3, L4 and L5 radiculopathies that were present April 4, 2012, have resolved.”
The record also reveals that two medical examiners originally concluded that Garrett had aggravated his preexisting condition based on their physical examinations of Garrett after the incident. However, they discounted their conclusions after confronted with the surveillance, conceding that what they saw on the surveillance whs different from how Garrett presented himself at examination.
From the above review of the law addressing the work-related accident and the aggravation of a preexisting medical condition, the WCJ’s conclusion rested on the evidence of Garrett’s continuing pain symptoms with which he returned to work in July 2012. That ongoing, unresolved pain associated with a non-work injury both discredits Garrett’s assertion of the new injury from an accident on- October 3, 2012, and is evidence that Garrett’s symptoms reported on October 3 existed before his crouching, down under the railcar, This conclusion by the WCJ is supported both by the testimony of the coworker and doctors. This conclusion is reasonable, and we therefore find that the WCJ’s judgment that no work-related accident occurred is not manifest error or. clearly wrong.

\ Appellee’s Answer

By answer to appeal, appellees seek to hav.e the ruling of the WCJ overturned regarding this fraud claim under La. R.S. 23:1208 (“Section 1208”). Section 1208 provides the following in pertinent part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representar tion,
* ⅜ * *
D, In addition tq the criminal penalties provided for in Subsection C of this Section, any person violating the provisions of this Section may be assessed civil penalties by the workers’ compensation judge of not less than five hundred dollars nor more than five thousand dollars payable to the Kids Chance Scholarship Fund, Louisiana Bar Foundation, and may be ordered to make restitution. Restitution may only be ordered for benefits claimed or payments obtained through fraud and only up to the time -the employer became aware of the fraudulent conduct. (Emphasis added) -
Initially, we note that courts have allowed this fraud restitution under Section 1208 even if the employer made voluntary payments. Abbeville General Hosp. v. Manor, 07-1226 (La.App. 3d Cir.3/12/08), 980 So.2d 163. However, we also note that the language in the statute, specifically the *720 use of “may” order allowance, provides that this remedy is not mandatory. Section 1208 lies within the discretion of the WCJ. Davis v. AMS Tube Carp., 02-2427 (La.App. 1st Cir.12/31/03), 868 So.2d 141, writ denied, 04-0286 (La.3/26/04), 871 So.2d 354.
In this case, the WCJ had already determined that Garrett is not entitled to workers’ .compensation benefits because there was no accident.' When faced with the allegation of fraud, the WCJ noted the following:
[As to fraud], ... while the surveillance video adversely reflects on Mr. Garrett’s reliability, particularly the extent of his post-accident restrictions; it is insufficient to prove a ‘false statement or | ^representation’ for purposes of 1208 fraud. See Lamartiniere v. Boise Cascade Gorp., 13-1075 (La.App. 3d Cir.4/9/14), 137 So.3d 119, 124, reversed in part on other grounds, 14-1195 (La.10/24/14), 149 So.3d 1234. Moreover, the statute vests the workers’ compensation judge with discretion in ordering civil penalties and/or awarding restitution. Under the circumstances of this case, the court declines to assess such sanctions here.
From our review of the record, we find no abuse of the WCJ’s discretion in its refusal .to impose, sanctions under Section 1208.

Conclusion

For the foregoing reasons, the judgment of the.WCJ in favor of appellees is affirmed. All costs of this appeal are assessed against Garrett.
AFFIRMED.

, Garrett had a prior lumbar spine surgery in 1997 and a cervical spine surgery in 2009. Garrett did not seek workers’ compensation benefits "in either of these instances for any work-related accident. <

. Voluntary payment of benefits by an employer does not constitute an' admission of liability under workers' compensation law, - ta. R.S. 23:1204; Hollingsworth v. Steven Garr Logging, 47,884 (La.App.2d Cir.2/27/13), 110 So.3d 1219.

. On November 29, 2012, Garrett is seen carrying a box. On November 30, 2012, he is seen doing some type of work with a mailbox and a wheelbarrow. On December 1, 2012, Garrett is seen going to a physician’s office with a walker, but later seen without the walker less than 30 minutes after leaving said office. On December 3, 2012, Garrett is seen standing, walking, and carrying a metal rake.'

. This describes pain which radiates along the anterior aspect of the thigh into the anterior leg is due to L4 or L3 radiculopathy. L2 pain is antero-medial in the thigh. Pain in the groin usually arises from an LI lesion.

. Appellees hired Dr. Partington to provide a review of Garrett’s medical records.