865 So.2d 301 (2004)
Marion HARRIS, Plaintiff-Appellant
v.
CASINO MAGIC, Defendant-Appellee.
No. 38,137-WCA.
Court of Appeal of Louisiana, Second Circuit.
January 28, 2004.
*302 The Young Firm by Timothy J. Young, New Orleans, Shannon V. Lobell, for Appellant.
Lunn, Irion, Salley, Carlisle & Gardner by Walter S. Salley, Shreveport, for Appellee.
Before WILLIAMS, STEWART and MOORE, JJ.
MOORE, J.
On February 20, 2001, claimant Marion Harris filed a disputed claim for compensation against Casino Magic seeking compensation benefits for back injuries he attributed to a slip and fall accident at work on March 19, 2000. Trial was held before the Office of Workers' Compensation ("OWC") on October 8, 2002, and the record was held open for the submission of additional medical evidence and depositions. During this time, the workers' compensation judge ("WCJ") who heard the case retired, and the case was submitted to a successor judge for a decision. The WCJ found that Harris failed to prove that his back injury was caused by his slip and fall and rejected his claim for compensation. Harris now appeals. For the reasons that follow, we reverse and remand.

Facts
At the time of the accident, Harris was a 67-year-old maintenance technician for Casino Magic, a riverboat casino on the Red River docked at Bossier City, Louisiana. He testified that while he was on lunch break, he entered one of the restrooms and suffered a fall when his feet "just slid out from under me." He "laid there a minute checking [himself] out to see if [he] had broken anything." Finding nothing broken, he went back to the break room. No one witnessed the incident, but Harris related the incident to one of his co-workers, Me-Shell Cook.
The following day, Harris reported the accident to his immediate supervisor, David Ashley. Ashley was off on the day *303 of the accident. The record contains a Casino Magic "Incident Statement," signed by Harris, Ashley and Me-Shell Cook, wherein Harris wrote the following account:
While going to lunch, I entered into the mens RR in the hold of the boat. Upon entering I slipped due to soap and water residue on the floor slightly injuring my right side hip/ankle. There were no signs propped up on the outside or placed in the middle of the floor. The only sign was propped"leaning" against the wall (bulkhead) with the mop bucketno sign posted. Reported to other employees on shiftthen reported to my supervisor the following day 3-20-2000.
Harris did not obtain or seek medical treatment for any injuries sustained from the fall until five months later on August 25, 2000. He testified that although he was sore from the fall, he did not believe he had been injured. Harris visited Dr. Rheams on March 21, 2000, two days following the accident, but he did not mention the fall or the injury; he only complained about recent weight loss. Dr. Rheams stated in his deposition that he would have made a notation on the patient's record if Harris had complained of any back or lower extremity pain.
Harris visited Dr. Rheams next on May 9, 2000 for an upper respiratory infection. Again, there is also nothing in the medical record of this visit regarding any complaint of any back pain or lower extremity pain, nor did Dr. Rheams recall that Harris made any such complaint.
During this time, Harris continued to work. In July of 2000, he applied for and was awarded a promotion from Maintenance Technician to Maintenance Supervisor, taking David Ashley's place on the swing shift (3:00 p.m. to 11:00 p.m.).[1] Ashley moved to the graveyard shift as maintenance supervisor.
On August 25, 2000, five months after the accident, Harris visited Dr. Wen Liu, a specialist in internal medicine, complaining of low back pain. Referring to his notes, Dr. Liu stated that Harris told him and his nurse that he had fallen two months earlier in a Casino Magic bathroom. He told Dr. Liu that his back pain had started approximately one month ago and had worsened in the past two weeks. Dr. Liu's examination notes state that Harris had left back tenderness two to three centimeters off midline. He notes that Harris could elevate both legs to 90 degrees. He suspected that Harris had possible lumbar disc herniation. Dr. Liu ordered an X-ray which showed moderate spondylolysis (disintegration of the vertebrae) of the lumbrosacral spine and a questionable spondylolysis of L-5 on left side. Dr. Liu stated that spondylolysis is associated with age and normal wear and tear. However, the L-5 "questionable" spondylolysis could indicate a herniated disc.
Harris returned to see Dr. Liu on September 26, 2000, with continued back pain and additional complaints of pain radiating in the left groin area and left leg. The doctor believed the additional complaint could be caused by disc herniation with nerve compression symptoms and recommended an MRI. The MRI radiologist reported *304 a possible disc herniation at L4-L5, and Dr. Liu subsequently referred Harris to Dr. Carl Goodman, an orthopedist.[2]
Dr. Goodman first examined Harris on October 17, 2000. Dr. Goodman testified by deposition that he related a history of an accident on March 19, 2000 and symptoms of back pain increasing three months prior to the date of the office visit. He noted that Harris said he was still working full-time in a supervisory job with very little physical work. Harris told Dr. Goodman that his pain was 100 per cent in his back, but he did experience some numbness and tingling in is left leg. Harris denied any prior back problems.
Dr. Goodman's physical examination involved several tests to determine any nerve encroachment problems. All the tests were negative, indicating that there was no nerve root involvement. The tests did not reveal any objective findings, but his review of the radiology studies led him to believe that Harris had some degenerative changes between the L3-L4 and L4-L5 vertebrae. Dr. Goodman said that there was no way to determine what caused these changes or how long Harris had this condition. Dr. Goodman ultimately diagnosed lumbar strain and sprain along with degenerative lumbar disc disease. Dr. Goodman recommended that Harris continue with the medication therapy prescribed by Dr. Liu and believed that Harris could continue working.
In January 2001, Harris returned to see Dr. Liu with continuing complaints of back pain and a history of falling on the wet floor at work. Dr. Liu recommended that Harris not work where he had to walk on slippery floors, but was of the opinion that Harris could work if not required to lift heavy objects. Harris saw Dr. Goodman again in March 2001 with a complaint of increased numbness in his right foot.
Harris resigned his position with Casino Magic shortly after this visit due to his back pain. He is currently receiving social security retirement benefits, and said that he would like to work but has not looked for work because of his back pain.
In April 2001, Harris returned to see Dr. Liu with the same complaints of back pain; Dr. Liu maintained his recommendation that he should do only mild lifting and limited sitting and standing at a job.
From July 2002 through October 2002, Harris saw Dr. Pierce Nunley, an orthopedist, and underwent physical therapy that reduced his back pain. The visits to Dr. Nunley cost $2,515.00 and the physical therapy cost $1,346.77, neither of which were paid by Casino Magic.
On November 6, 2002, Dr. Goodman reexamined Harris, repeating his original diagnosis, but he was ambivalent about Harris' return to work. He recommended that Harris not do maintenance work, but approved a supervisory job in which he would not do any heavy lifting.
After considering all of this evidence, the WCJ concluded that Harris had failed to carry his burden of proving the causal connection between his accident and his back pain. Harris appeals.

Discussion

Applicable Law
An injured employee is entitled to receive benefits for an injury that arises *305 out of and in the course of his employment. La. R.S. 23:1031. The injured employee bears the initial burden of establishing the causal connection between the disability and the employment accident by a reasonable preponderance of the evidence. The claimant is not required to establish the exact cause of the disability, but must demonstrate by a preponderance of proof that the accident had a causal connection with the disability. Quinones v. USF & G, 93-1648 (La.1/14/94), 630 So.2d 1303; Thompson v. Dillard's Department Store, 32,974 (La.App. 2 Cir. 5/10/00), 759 So.2d 1074. Proof by a preponderance of the evidence exists when the evidence, taken as a whole, shows the facts sought to be proved are more probable than not. Thompson, supra; Harris v. Coushatta Industrial Sand, Inc., 31,977 (La.App. 2 Cir. 06/16/99), 741 So.2d 143.
The causal connection can be established when the employee proves that before the accident he was in good health, but commencing with the accident, symptoms of the disabling condition appeared, and there is sufficient medical evidence to show a reasonable possibility of a causal connection between the accident and the disabling condition. Quinones v. USF & G, supra; Thompson, supra. However, an employee's pre-existing condition does not disqualify his claim if the work-related injury either aggravated or combined with the infirmity to produce the disability for which compensation is claimed. Thompson, supra; Harris, supra. When the claimant proves that he had no disabling symptoms before the accident, but that commencing with the accident, the disabling symptoms appeared, and there is medical or circumstantial evidence indicating a reasonable possibility of a causal connection between the accident and the disabling condition, a claimant's work injury is presumed to have aggravated a pre-existing infirmity to produce his disability. Thompson, supra; Harris, supra.
Whether the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the hearing officer. Harris, supra. Factual findings in worker's compensation cases are subject to the manifest error rule. Hoy v. Gilbert, 98-1565 (La.3/2/99), 754 So.2d 207; Harris, supra. Under the manifest error rule, the reviewing court does not decide whether the factual findings are right or wrong, but whether they are reasonable. Stobart v. State, 617 So.2d 880 (La.1993); Graham v. Georgia-Pacific Corp., 26,165 (La.App. 2 Cir. 09/23/94), 643 So.2d 352. The manifest error/clearly wrong standard of appellate review applies in compensation actions even when the trial court's decision is based solely upon written reports, records or depositions. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992). However, the appellate court is not required by the manifest error principle to affirm the trier of fact's refusal to accept as credible uncontradicted testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles. Bruno, supra, citing West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979).

Analysis
The causation problem in this case arises out of the five-month period of time that elapsed between the date of the accident and the first medical record of complaints regarding the injury. Dr. Rheams testified that sometimes people have accidents that start hurting only a day or two later. He speculated that perhaps Harris did not tell him about his complaints because he did not think he was that kind of doctor. Dr. Liu testified that it was possible *306 that the fall caused Harris' back pain, but normally, with regard to disc herniation, back symptoms begin within a day or two of the accident. Dr. Goodman, an orthopedic surgeon, was deposed twice. He stated the following in his first deposition:
Q. Now, doctor, with regards to his complaints of low back pain with left leg numbness, as far as an opinion of causation of those symptoms, how do you determine whether or not symptoms are related to an accident?
A. I have to depend on the history as what the patient told me.
Q. And what type of history are you looking for to determine whether or not symptoms are related to an accident?
A. Well, I mean, he justhe had a he fell and he hurt himself and had pain.
Q. * * * Is there a time frame after the accident of March 19, 2000 that you would expect that Mr. Harris would begin to develop pain if his back if, in fact, it is related to that accident?
A. Yes
Q. What would that be?
A. Fairly immediate, within days.
* * *
(Exhibit J-7, p. 13)
But Dr. Goodman later stated:
Q. Now, as far as the causation issue, would you have any opinion more probable than not as to whether or not the right foot numbness was related to the accident of March 19, 2000?
A. If I assume that he hurt his back in March of 2000 and aggravated a preexisting degenerative disc problem, I would have to relate this to that, yes.
(Exhibit J-7, p. 15)
Dr. Goodman equivocated somewhat, stating that the degenerative changes in Harris' back were a result of wear and tear. Dr. Goodman did not have an opinion that these changes were caused by the at-work accident. However, he said that previously asymptomatic degenerative disc disease could be made symptomatic by even a mild traumatic event such as a fall. The doctor stated that pain as a result of an accident typically surfaces within a few days or perhaps up to two weeks from the accident and that the pain can begin and steadily increase to a point where the patient needs treatment.
In summary, Harris' medical records and the depositions of his doctors reveal no complaints of back pain for several months after the accident, and this is clearly a relevant factor. Nevertheless, the failure to make a prompt complaint to a physician does not necessarily defeat the claim. Bruno v. Harbert International, Inc., supra. Even though Harris did not see a physician immediately after the accident, he stated in the accident report that he injured his right side hip and ankle. He testified at trial that he thought the injury to his hip was due to landing on his radio attached to his side. He testified that he felt "soreness" after the accident that progressed to the point of severe back pain about three months after the accident. He testified, "[Before, I just thought that it was, you know, bruised up, or something, and I'd get over it.... But about that three months is when I started realizing thatthat it wasn't that; that I was hurt." His wife testified that she did not recall when Harris first complained of back pain after the accident, but she said that he complained of pain "ever since it happened" and that the pain gradually got worse.
Dr. Goodman observed that a trauma can make a previously asymptomatic degenerative disc become painful, and that he would expect this pain to arise within two weeks after the trauma. Harris' testimony *307 about when his back pain began was not especially precise. However, the record as a whole, including the depositions of the doctors, shows that the only conclusion to be drawn from the evidence is that Harris' symptoms of back pain commenced after the accident. Dr. Liu reported that Harris reported no back pain prior to the accident, and Harris testified that his "soreness" commenced with the fall and progressed into pain. None of the medical records introduced into evidence contradict this portion of Harris' history to Dr. Liu. Harris' wife corroborated all his essential complaints, and Dr. Goodman confirmed that this type of pain could become gradually worse. On this record, the WCJ was plainly wrong not to find causation.

Conclusion
We conclude that the record as a whole permits only the conclusion that Harris' back pain was caused by his fall at work. Accordingly, the judgment of the OWC is reversed and this matter is remanded to the OWC for further proceedings. Costs of this appeal are assessed to appellee, Casino Magic.
REVERSED AND REMANDED.
NOTES
[1] Karen Phillips, an administrative assistant and manager of Facilities in Marine Operations for Casino Magic, testified that when Harris was given the supervisor's position, David Ashley volunteered to move to graveyard shift, thinking that Marion Harris' health was so bad that he would be unable to work the graveyard shift. Ms. Phillips testified that Harris was in poor health and complained frequently of a variety of health problems, including hip problems and chest pains among others. Harris denied ever discussing his health with Ms. Phillips.
[2] Dr. Liu's notes and testimony reflect that Harris complained about pain and numbness in his left leg. Dr. Goodman testified by deposition that Harris complained of numbness in his left leg at his initial visit of October 17, 2000. Dr. Goodman saw Harris again in March of 2001 and reported that Harris complained of pain and numbness in his right foot. When asked to explain the inconsistency in his record, Dr. Goodman speculated that the inconsistency could be a dictation error.