# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 18-828

DAVID CHAISSON

VERSUS

PELLERIN & SONS, INC.

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT NO. FOUR
PARISH OF LAFAYETTE, NO. 17-04379
ANTHONY PALERMO, WORKERS' COMPENSATION JUDGE

**********

## VAN H. KYZAR
## JUDGE

**********

Court composed of John D. Saunders, Van H. Kyzar, and Candyce J. Perret, Judges.

**AFFIRMED.**

Tracy P. Curtis
The Glenn Armentor Law Corporation
300 Stewart Street
Lafayette, LA 70501
Phone (337) 233-1471
COUNSEL FOR PLAINTIFF/APPELLANT:
    David Chaisson

Jeffrey J. Warrens
Johnson, Rahman & Thomas
P.O. Box 98001
Baton Rouge, LA 70898-8001
Phone (225) 231-0652
COUNSEL FOR DEFENDANT/APPELLEE:
    Pellerin & Sons, Inc.

**KYZAR, Judge.**

The plaintiff in this workers' compensation case, David Chaisson, appeals from a judgment finding that he failed to prove that he suffered a work-related accident and dismissing his claim against the defendant, Pellerin & Sons, Inc., with prejudice. For the following reasons, we affirm.

## DISCUSSION OF THE RECORD

Mr. Chaisson was a twenty-five year employee of two family-owned businesses, Pellerin & Sons, Inc. (Pellerin & Sons), a demolition company, and Pellerin & Wallace, Inc., a roofing company. He allegedly suffered a work-related injury on June 12, 2017, while working as a helper on a Pellerin & Sons' roll-off truck. The truck, driven by David Pellerin (David), a co-owner of Pellerin & Sons, was used to transport dumpsters and consisted of a cab and a rear chassis, which contained a winch and a loading mechanism. During loading, the truck is backed up to the dumpster, after which a helper attaches the winch cable to the front of the dumpster, which is then pulled onto the rear chassis. The process is reversed during unloading. During transport, the rear of the dumpster is strapped to the chassis by one strap, as required by the department of transportation.[1]

---

[1] Neither party indicated whether the department of transportation was the United States Department of Transportation or the State of Louisiana Department of Transportation and Development. However, 49 CFR § 393.134(b) requires, in part, that the "[s]ecurement of a roll-on/roll-off and hook lift container" that is "carried on a vehicle which is not equipped with an integral securement system" be:

(1) Blocked against forward movement by the lifting device, stops, a combination of both or other suitable restraint mechanism;

(2) Secured to the front of the vehicle by the lifting device or other suitable restraint against lateral vertical movement;

(3) Secured to the rear of the vehicle with at least one of the following mechanisms:

    (i)     One tiedown attached to both the vehicle chassis and the container chassis;

    (ii)    Two tiedowns installed lengthwise, each securing one side of the container to one of the vehicle's side rails; or

As the driver's helper, Mr. Chaisson attached the winch cable to the front of the dumpster so it could be loaded and then strapped the rear of the dumpster to the chassis. This entailed running a strap, which was fixed to the driver's side frame of the chassis, through openings located between the skids upon which the dumpster rested and the floor of the dumpster, and then connecting the strap to the opposite side of the chassis. Mr. Chaisson and another Pellerin & Sons' employee both indicated that they pulled the strap from one side of the chassis to the other by going underneath the chassis.

On June 12, 2017, Pellerin & Sons was in the course of demolishing several buildings for Frank's International (Frank's) at 700 E. Verot School Road in Lafayette, Louisiana. Mr. Chaisson alleged that he suffered a work-related injury to his lower back when David drove the roll-off truck forward while he was under the truck strapping the dumpster to the chassis. He claimed that he quickly fell to his knees in order to prevent his head from being struck by the chassis. Mr. Chaisson at first refused to get back into the truck with David, but after he did and they reached Pellerin & Son's office, he informed David that he quit and walked off.

On July 20, 2017, Mr. Chaisson filed a disputed claim for compensation against Pellerin & Sons, alleging that he suffered an injury to his neck and lower back as a result of his June 12, 2017 accident.[2] He claimed that Pellerin & Sons had not paid wage benefits or authorized medical treatment, and he requested that he be allowed to see the physician of his choice. Mr. Chaisson further alleged that Pellerin & Sons was liable for penalties and attorney fees based on its failure to timely pay

<hr>

        (iii)    Two hooks, or an equivalent mechanism, securing both sides of the container to the vehicle chassis at least as effectively as the tiedowns in the two previous items.

[2] Mr. Chaisson also applied for unemployment benefits on June 19, 2017. However, his application was ultimately denied on August 16, 2017.

2

or contest his right to workers' compensation benefits. Pellerin & Sons initially denied Mr. Chaisson's claims, but then filed a supplemental and amending answer, in which it alleged that Mr. Chaisson was intoxicated at the time of the alleged accident. Thus, it claimed that Mr. Chaisson forfeited his entitlement to workers' compensation benefits pursuant to La.R.S. 23:1081.

Following a March 1, 2018 hearing on the merits, the matter was taken under advisement by the workers' compensation judge (WCJ). Thereafter, on April 13, 2018, the WCJ issued an oral ruling, granting judgment in favor of Pellerin & Sons and dismissing Mr. Chaisson's claim against it with prejudice. A written judgment was rendered on June 5, 2018. It is from this judgment that Mr. Chaisson appeals.

On appeal, Mr. Chaisson raises three assignments of error:

1. The WCJ clearly erred by concluding that any evidence discredited or cast serious doubt on plaintiff's incident-related testimony.

2. The WCJ clearly erred by its failure to conclude that the circumstances following the incident corroborated plaintiff's testimony.

3. The WCJ clearly erred by basing its ruling on its own medical causation opinion and by misunderstanding the medical evidence, all of which the WCJ used to find plaintiff to be not credible.

**OPINION**

In *Calumet GP, LLC v. Garrett*, 50,341, pp. 3-5 (La.App. 2 Cir. 1/20/16), 186 So.3d 712, 715-16, *writ denied*, 16-301 (La. 4/8/16), 191 So.3d 587, the second circuit set out the standard of appellate review applicable in workers' compensation cases and the burden of proof that a claimant must satisfy to prove a work-related accident:

In a workers' compensation case, the appropriate standard of review to be applied by the appellate court to the WCJ's finding of fact is the manifest error or clearly wrong standard. *Dean v. Southmark Const.*, 03-[]1051 (La. 7/6/04), 879 So.2d 112; *Dunlap v. Madison Parish Sch. Bd.*, 46,139 (La.App.2d Cir.4/13/11), 61 So.3d 833. Whether the claimant has carried his burden of proof and whether

3

testimony is credible are questions of fact to be determined by the WCJ. *Dunlap; supra; Harris v. Casino Magic*, 38,137 (La.App.2d Cir.1/28/04), 865 So.2d 301, *writ denied*, 04-0502 (La.4/8/04), 870 So.2d 275. Unless shown to be clearly wrong, the WCJ's factual findings of a work-related disability will not be disturbed where there is evidence which, upon the trier of fact's reasonable evaluation of credibility, furnishes a reasonable, factual basis for those findings. *Id.* When a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989); *Wilson v. General Motors Corp.*, 45,232 (La.App.2d Cir.5/26/10), 37 So.3d 602. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Rosell, supra; Morgan v. Glazers Wholesale Drug Co.*, 46,692 (La.App.2d Cir.11/2/11), 79 So.3d 417. The trier of fact's determinations as to whether the worker's testimony is credible and whether the worker discharged the burden of proof are factual determinations, not to be disturbed upon review unless clearly wrong. *Harris v. City of Bastrop*, 49,534 (La.App.2d Cir.1/14/15), 161 So.3d 948; *Thomas v. GM Benefits & Serv. Ctr.*, 48,718 (La.App.2d Cir.1/15/14), 132 So.3d 464.

An employee is entitled to worker's [sic] compensation benefits if he receives a personal injury by accident arising out of and in the course of his employment. La. R.S. 23:1031; *McLin v. Industrial Specialty Contractors, Inc.*, 02-1539 (La.7/2/03), 851 So.2d 1135; *Scott v. Super 1 Foods*, 45,636 (La.App.2d Cir.9/29/10), 48 So.3d 1133. An employment-related accident is an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration. La. R.S. 23:1021(1). The term "accident" includes a weakened condition which collapses due to a precipitous event. *Rice v. AT & T*, 614 So.2d 358 (La.App. 2d Cir.1993).

Although the workers' compensation law is liberally construed in favor of coverage, the claimant's burden of proving an accident is not relaxed; she must prove by a preponderance of the evidence that an accident occurred and the resulting disability is related to an on-the-job injury. *McLin, supra; Hofler v. J.P. Morgan Chase Bank, N.A.*, 46,047 (La.App.2d Cir.1/26/11), 57 So.3d 1128, 1134. When the accident at question is unwitnessed, a worker's testimony alone may be sufficient to discharge claimant's burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts doubts upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *Bruno v. Harbert Int'l, Inc.*, 593 So.2d 357, 360-61 (La.1992).

In his three assignments of error, Mr. Chaisson basically argues that the trial court was manifestly erroneous in finding him not credible as a witness and by failing to find that his testimony, alone, was sufficient to prove that the accident occurred. However, we find no merit in these arguments.

In describing the incident, Mr. Chaisson testified that he was under the truck, strapping the dumpster to the chassis, when David drove forward approximately fifty feet. He stated that while he was under the truck, he heard David put the truck into gear and rev the engine, so he let go of the strap, ducked his head, and then fell onto his knees as the truck started forward. He stated that he stopped his fall by putting his hands down onto the ground, which prevented his face from hitting the ground.

At the time of this incident, Mr. Chaisson testified that Andrus Pellerin, David's father and a co-owner of Pellerin & Sons, was standing on the passenger side of the truck, next to him. At first he stated that Andrus would not have seen him fall because he was underneath the truck. However, he later stated that Andrus would have seen the incident. He claimed that he said nothing about the incident to Andrus once he stood up. Instead, Mr. Chaisson testified that he went to the driver's side of the truck and confronted David, stating to him, "What the hell you doing? I almost got killed underneath the truck. You took off fifty, sixty feet." He stated that David stepped out onto the truck's step and started cussing him. He said that he eventually climbed into the truck, and while in the cab, David continued arguing with him and then punched him in the face. However, in a rule to show cause filed by his attorney, Mr. Chaisson claimed that David only struck him on the arm. He further denied that David said anything about him taking a drug test. Once they arrived back at Pellerin & Sons' office, he stated that he exited the truck, told David that he quit, and started walking towards the bus stop. He said that he quit because

5

David punched him in the face and because of the incident while he was under the truck.

Mr. Chaisson testified that after he had walked a little ways from the office, he received a call from Donald Pellerin, David's brother, who said that he would pick him up and take him to his truck. When asked about the incident, he said that he replied that David "almost got me killed underneath the truck." He said that Donald only replied, "Boy, boy, boy. That boy there." He further stated that he did not complain to Donald that his back was sore.

Mr. Chaisson testified that he contacted Phyllis Dumesnil, Pellerin & Sons' office manger, the day after the incident. His testimony was conflicting as to whether he informed Ms. Dumesnil about his injury. During direct examination, he stated that he called her because his back was hurting. However, during cross examination, he said that he did not mention his back pain to Ms. Dumesnil. However, when reminded that during his deposition he said that he told her about his injury, he stated that it was accurate that he told her about his injury. Additionally, Mr. Chaisson testified that his back did not start hurting until the next day. However, in his deposition, he stated that his back began hurting while he was walking to the bus stop. He clarified that his back felt sore while he was walking to the bus stop.

Mr. Chaisson testified that he was seen by Dr. Michael Heard, a Lafayette, Louisiana orthopedic surgeon, approximately one month after his accident. He stated that he was not contacted by anyone from Pellerin & Sons concerning his workers' compensation claim during the interim. He explained that although he sought treatment from the University Medical Center in Lafayette on many occasions, he did not do so this time because he felt that Pellerin & Sons was responsible for his injury.

6

Mr. Chaisson testified that he applied for unemployment benefits after this incident because he needed money. He stated that although he spoke to someone from Baton Rouge, they never got back with him. He said that he was unaware that he could not receive unemployment benefits if he was hurt. He also said that he applied for Social Security benefits but was denied.

David testified that while at Frank's, he watched Mr. Chaisson through his driver's side mirror during the entire operation of loading the dumpster onto the truck. After Mr. Chaisson attached the winch to the dumpster, he stated that he saw him and Dwayne Senegal, an employee of Cecil Perry Contractors, standing at the rear of the chassis while the dumpster was pulled onto the truck. As soon as that was accomplished, David testified that he drove the truck toward the gate, so Mr. Chaisson could strap the dumpster to the truck. He claimed that he saw Mr. Chaisson in his mirror the entire time, and he never saw him affix the strap prior to him moving the truck.

David testified that he then waited for Mr. Chaisson to strap the dumpster to the truck. Instead, he said that Mr. Chaisson told him, "I'm not getting in the truck with you. I'm not going with you. I'm staying here." He stated that Mr. Chaisson had never done this before, and they started arguing. He said that he then told Mr. Chaisson, "You need to get over here. You['re] coming with me." "Get your ass in the truck. You're coming with me." David testified that Mr. Chaisson eventually strapped the dumpster down and climbed into the truck's cab. Once there, he stated that they continued arguing and that he told Mr. Chaisson, "You're drunk. You're not staying over here with these people. This is a safety place. You have no right to stay here. You're gonna hurt yourself or you're going to hurt someone." He said that he further told Mr. Chaisson, "I'm bringing you to the shop. You're going to

7

take a drug test." He stated that Mr. Chaisson replied, "I'm not doing a f—king thing for you. I quit."

When they arrived at Pellerin & Sons' office, David testified that he walked in and asked the secretary, "What I'm supposed to do with this here drunk son of a bitch?" He stated that Mr. Chaisson started walking down the road after exiting the truck, but as he looked out the door, he saw him walk back toward the truck. He said that he asked Mr. Chaisson what he was doing, but that Mr. Chaisson answered, "I'm getting my telephone." He stated that Mr. Chaisson said, "You gonna see what I'm gonna do when I'm finished with y'all," and then he walked off.

David testified that he knew Mr. Chaisson was drunk because he noticed the smell of alcohol on him when they started working at 5:30 a.m. He claimed that Mr. Chaisson was drunk from the night before and that he was always drunk on the job. Despite his suspicion, he said that he allowed Mr. Chaisson to continue working because his father, Andrus, wanted him to work. He stated that Mr. Chaisson was still employed by Pellerin & Sons "[o]ut of the goodness of [his] father's heart." After the incident, David claimed that he intended for Mr. Chaisson to undergo a drug test because he had recently met with his insurance company, which demanded that Pellerin & Sons drug test any person it suspected of being impaired. Despite the fact that he knew that Mr. Chaisson was impaired at 5:30 a.m., he claimed that he never mentioned the drug test until the incident in question occurred, at approximately 9:00 a.m., because "when he disagreed and didn't want to get in the truck and that, I said he's drunk, and I got to do something."

David testified that Mr. Chaisson said nothing to him about the alleged incident under the truck. He said that it was his impression that Mr. Chaisson refused to get in the truck because he was either drunk or he wanted to stay at Frank's to work or scavenge for scrap iron. David admitted that he heard Mr. Chaisson say,

8

"All I do for y'all, and that's the way you're going to treat me. I quit." He stated that he thought Mr. Chaisson said this in response to his demand that he undergo a drug test.

Although a co-owner of the business, David testified that he was unfamiliar with Pellerin & Sons' drug policy. However, he agreed that an employer is required to furnish its employees with a safe work environment, including being free from the hazards presented by an intoxicated employee. David was adamant that Mr. Chaisson was drunk when he started work at 5:30 a.m. However, in Pellerin & Sons' appeal to Mr. Chaisson's request for unemployment benefits, he stated that he only noticed that Mr. Chaisson was drunk later that morning. David denied that he used the word "later" because he did not want to admit to the Louisiana Workforce Commission that he allowed Mr. Chaisson to work despite the fact that he was drunk at 5:30 a.m.

Donald testified that he was on a job when his sister called and informed him about the incident between David and Mr. Chaisson. He stated that he called Mr. Chaisson to offer him a ride back to his vehicle, which was at David's home. He said that Mr. Chaisson accepted his offer, and after he picked him up, he asked him about what had happened. He said that Mr. Chaisson told him, "Your brother hit me." "He ain't never going to put his hands on me again. I'm going to get him." Donald testified that he asked Mr. Chaisson where David hit him, to which he replied, "In the arm." "I picked my arm up and he hit my arm." He stated that Mr. Chaisson related the incident at Frank's, by stating, "We was at Frank's over there." "I was going to strap the truck down - - strap the box down and he pulled up. And if I wouldn't have got out of the way, he would have hit me, and I would have got hurt." Donald testified that Mr. Chaisson then stated that he was going to get back at David by suing him.

9

Donald testified that he informed Mr. Chaisson that his sister wanted him to return to Pellerin & Sons' office to do a drug test. He stated that Mr. Chaisson responded, "I ain't taking no fucking drug test. I don't - - you can tell your sister I'm not going to sue the company. I'm going to sue your brother, personally. He's never going to put his hands on me again." Donald claimed that he then advised Mr. Chaisson to "[g]o home and sleep it off and come back to work tomorrow[,]" because he reeked of alcohol, but that Mr. Chaisson responded, "I'ain't never coming back to work." "I'm going to get him." "He ain't never going to put his hands on me again." He stated that Mr. Chaisson then continued, "When I get home, I'm going clean up, and I'm going back [to] Poppa P's[3] again and finish it off." Donald stated that this was where Mr. Chaisson had been the night before. Although he claimed that Mr. Chaisson reeked of alcohol, he thought that the smell was from the night before. He stated:

> It's not like he was drinking on the job or drinking that day. And it was periodically. I know how he is when he's drunk. He starts yapping and yapping and irritates you until you want to do him something. And he knows he's irritating you, and that's how he is when he's drunk. That's how he acts.

He further claimed that Mr. Chaisson drank every night.

Donald testified that Mr. Chaisson never said that he was under the truck when the incident occurred. He stated that if Mr. Chaisson had been hurt, he would have taken him straight to the hospital. He said that it is Pellerin & Sons' policy to immediately report accidents and for employees to undergo drug tests anytime there is a near miss. Donald testified that Mr. Chaisson should have undergone a drug test because he reported that he was nearly hurt on the job. He denied that Mr. Chaisson told him that he was almost killed as a result of the incident.

---

[3] Poppa P's is a bar.

Ms. Dumesnil, Andrus' secretary, testified that she handled all workers' compensation claims for Pellerin & Sons. She stated that she learned that Mr. Chaisson quit after the incident on June 12, 2017, from David. She stated that David slammed into the Pellerin & Sons' office and asked her, "What am I going to do with that drunk?" She stated that she told David to either have Mr. Chaisson undergo a drug screen or take him home. She said that she could see Mr. Chaisson through the open door and that he was standing next to the truck, with his back turned towards her. Ms. Dumesnil testified that David further stated that Mr. Chaisson had wanted to remain at Frank's, but that he would not let him stay there because he was drunk and because it would be dangerous to leave him there.

Ms. Dumesnil testified that she spoke to Mr. Chaisson after the incident when he called to request his pay records so that he could file for unemployment benefits. She stated that he did not discuss the incident with her, other than to say that he had a disagreement with David, which did not involve her. She said that she mailed the records to him after June 15, 2017, which was Mr. Chaisson's final pay date. Ms. Dumesnil testified that she first learned about Mr. Chaisson's alleged injury when Pellerin & Sons received the First Report of Injury, approximately one month after the incident.

Andrus, a co-owner of Pellerin & Sons, testified that he ran the demolition crew with David and was on site at Frank's the day of Mr. Chaisson's alleged accident. He stated that he was operating an excavator, which was used to pack debris into the dumpsters. After David picked up a dumpster, Andrus testified that he used the excavator to scrape up any debris that had fallen to the ground during loading. He stated that he never saw Mr. Chaisson fall under the truck. He stated that if Mr. Chaisson had fallen, he would have been seen by the two safety personnel on site, who would have stopped the job. He stated that a safety man would have

11

been standing by the truck while the dumpster was being loaded onto it. He stated that a third safety person was located on the third floor of Frank's new building, who watched the site through binoculars.

Andrus testified that he never knew why Mr. Chaisson quit, but that he had Ms. Dumesnil try to contact him at least five times because he wanted him to return to work. He stated that he only learned about Mr. Chaisson's alleged injury when Pellerin & Sons received the First Report of Injury. Andrus testified that he never saw Mr. Chaisson go under the truck to strap down a dumpster. He stated that it was unnecessary to go under the truck in order to strap down a dumpster. Instead, he stated that the helper would only have to pass the strap "over the frame of the truck[,]" then walk behind the truck to the other side, catch it, and then hook it in place and ratchet the strap tight. He further stated that Mr. Chaisson would not have been hurt if he was under the truck when David drove it forward because the strap was located past the truck's last axle.

Mr. Senegal testified that he was assigned to work as a safety person at Frank's during Pellerin & Sons' demolition at the site. He stated that his assignment came about due to numerous complaints from Frank's safety person regarding safety violations committed by Pellerin & Sons during the demolition. He said that the Frank's safety person was on site every day and watched the demolition process from the balcony of Frank's new building, which overlooked the site, and took and emailed pictures of Pellerin & Sons' safety violations to his employer, Cecil Perry. Mr. Senegal testified that he acted as safety person on site from June 2 through June 15, 2017, and that he was on site on June 12, 2017, from 7:00 a.m. through 3:30 p.m. He stated that as the safety person, he made on-the-spot safety corrections and that if a person continued making safety infractions, he was to immediately remove them from the job.

12

Mr. Senegal testified that the transfer of dumpsters at the Frank's site occurred approximately ten to fifteen times a day and that he watched the majority of them for safety issues. He stated that he saw no injuries or near misses during his tenure at Frank's and that he never saw anyone trip or fall during that time. Had he seen the incident in question, he said that he would have investigated it and made a call to Cecil Perry's safety hotline. Mr. Senegal further testified that he never saw Mr. Chaisson, who he knew very well, intoxicated on the site. If he had, he stated that it would have been a safety violation and that Mr. Chaisson would have been required to leave the site immediately. He further stated that although he was on site all day on June 12, 2017, he could not recall if he saw either David or Mr. Chaisson.

Concerning Pellerin & Sons' actions in moving the dumpsters, Mr. Senegal testified that he felt that the truck drivers were "kind of dangerous" and that he had to ask David to slow down a couple of times. He further stated that David was "a bit rambunctious" in moving the dumpsters and that he had to tell him several times to put on his personal protective equipment. Mr. Senegal testified that he also had to tell the helpers to wait for the truck to completely stop before they jumped out to hook the dumpster to the truck. He further stated that he had seen Andrus, who he described as a firecracker, yelling at Pellerin & Sons' workers. He also described David as "kind of fuss and cuss too. It's like that's the way they communicate. Yell and fuss and cuss."

In lieu of trial testimony, the parties introduced the recorded statements of Pellerin & Sons' employees Johnny Edwards, Carlos Caro, and Dustin Bourque. Mr. Edwards, a laborer, stated that he took over as helper on David's truck after Mr. Chaisson quit. He stated that the quickest way to strap a dumpster to the chassis was to go underneath the truck to pass the strap to the other side of the truck. He stated that he was working at Frank's at the time of the alleged accident, but that he was

13

sweeping up debris on the side of the truck after it was loaded. He said that he was not aware of Mr. Chaisson's accident until Pellerin & Sons received notice of the incident.

Mr. Caro, a laborer, stated that he was working as a helper on another roll-off truck at the time of Mr. Chaisson's accident. He stated that he only saw the interaction between Mr. Chaisson and David, when Mr. Chaisson refused to get in the truck.

Mr. Bourque, a driver, stated he arrived at Frank's to pick up a dumpster, just after David loaded the dumpster onto his truck. He stated that David drove his truck to the gate to make way for his truck. He stated that this was where David would strap his dumpster to the truck. He then stated that when he first noticed David's truck, the dumpster was already loaded and strapped down onto the truck.

Mr. Bourque stated that he had just loaded a dumpster onto his truck, when he saw David and Mr. Chaisson arguing at the gate. He stated that Mr. Chaisson walked from the rear of the truck towards the front and told David that he was not getting in the truck. He said that David hollered at him to get in the truck because they were holding up traffic, after which they left the site.

Dr. Heard's July 13, 2017 medical records report that Mr. Chaisson experienced mid and low back pain after an incident on June 12, 2017, when "[t]he patient was under a truck trying to strap a box and the driver of the truck took off causing the patient to pull his low back." After examining him, it was Dr. Heard's impression that Mr. Chaisson suffered an occupational injury on June 12, 2017, with resulting post-traumatic midback pain and post-traumatic lower back pain, with left-sided radiculitis. Dr. Heard treated Mr. Chaisson through February 7, 2018, at which time it was his impression that Mr. Chaisson was suffering from mid back and lower back pain, with left-sided radiculitis and facet arthropathy, for which he

14

recommended a facet injection at L4-5 and L5-S1. It was his opinion that Mr. Chaisson had not reached medical maximum improvement.

In his oral reasons for judgment, the WCJ stated as follows:

> This trial involves an alleged accident, which took place on June 12, 2017. The parties agree that June 12, 2017 is the last day that Mr. Chaisson worked for Pellerin and Sons. The dispute between the parties concerns whether an accident occurred in the course and scope of employment on that day. Mr. Chaisson testified that while he was hooking up a trailer he slipped and injured his back. Mr. Chaisson alleged that in the process of securing the DOT strap David Pellerin began moving the truck forward and that this caused Mr. Chaisson to stumble and fall injuring his back.
>
> The testimony of Mr. Chaisson is directly contradicted by the testimony of Andrus Pellerin and David Pellerin. Mr. Chaisson walked off the job according to his testimony because he felt that he was almost killed in the incident and that the employers did not really care about the fact that he was put in harms way. The employer alleges that Mr. Chaisson walked off the job, because he did not want to take a test for intoxication. Mr. Chaisson was eventually seen by Dr. Michael Heard on July 13, 2017. At that time Dr. Heard felt that Mr. Chaisson should not work and should receive medical treatment for his injury. It should be noted that the injury relayed to Dr. Heard was much the same as David Chaisson testified to.
>
> The issue is whether David Chaisson proved that he had an accident in the course and scope of employment. An employee may prove by his or her testimony alone that an accident occurred if the employee can satisfy two elements. No other evidence discredits or cast serious doubt upon the worker's version of the incident and the worker's testimony is corroborated by the circumstances following the alleged accident. Bruno versus Harbert International Incorporated, 593 Southern Second 357 Louisiana 1992[.] Corroboration of a worker's self serving testimony may be provided by the testimony of fellow workers, spouses, friends or by medical evidence.
>
> When we look at this case the question arises did Mr. Chaisson prove by his testimony alone that he was involved in an accident in the course and scope of employment. The Court notes that throughout the testimony involved in this trial the Court came to doubt the credibility of everyone involved. Each person has their own ax to grind in this case. They all have interest; that they are trying to protect, therefore the Court has to cast an eye on exactly what the testimony was and who gave it. After reviewing the testimony of David Chaisson, Andrus Pellerin, and David Pellerin the Court finds that Mr. Chaisson failed to prove that an accident occurred in the course and scope of employment. Specifically the mechanism of the accident leads to questions about whether they would've lead [sic] to the injuries that Mr. Chaisson

supposedly sustained. In addition, Mr. Chaisson has a complex and extensive history with regards to treatment for his back. The fact that Mr. Chaisson failed to seek medical treatment for approximately thirty days seriously calls into question the occurrence of an accident.

The Court therefore does not feel that Mr. Chaisson's credibility leans [sic] itself to establishing that an accident occurred by a preponderance of the evidence when his testimony is contradicted by other testimony and is not really corroborated by testimony and/or the medical evidence. The Court therefore denies David Chaisson's claim for workers' compensation benefits and dismisses his suit with prejudice.

After reviewing the record in its entirety, we find that the WCJ was presented with conflicting views of the evidence and that his decision rested entirely on credibility determinations he made as to all of the witnesses testifying in this matter, including Mr. Chaisson.

The testimony reveals multiple conflicting issues regarding the alleged accident and the following circumstances. Mr. Chaisson first claimed that no other witness saw the accident, but then testified that Andrus was standing next to him and would have seen him fall. David testified that Mr. Chaisson never went under the truck before he drove the truck away from the loading area. Andrus testified that he was on the excavator the entire time and never saw the incident. Mr. Senegal, the only neutral party to testify, stated that if he had seen the incident, he immediately would have investigated it and reported it on the safety hotline. He further said that the incident would have been seen by Frank's safety person, who was watching through binoculars from a point overlooking the site. Both Andrus and David claimed that it was not necessary for Mr. Chaisson to go under the truck when strapping the dumpster to the chassis. However, both Mr. Chaisson and Mr. Edwards stated that they strapped the dumpster to the chassis by going underneath the chassis. Mr. Edwards said that this was the quickest way to strap a dumpster to the truck.

16

Andrus stated that Mr. Chaisson would not have been hurt if he was under the truck when David drove forward because the strap was located past the truck's last axle. This was confirmed by Mr. Bourque, who stated that Mr. Chaisson could not have been hurt because he was wearing a hard hat and because the truck rolled forwards instead of backwards.

Following the incident, both Mr. Chaisson and David admit that they had words before Mr. Chaisson finally consented to get back in the truck. This was confirmed by Mr. Caro and Mr. Bourque. Mr. Chaisson then claimed that David punched him in the face, although in a prior court filing he claimed that David struck him on the arm. David claimed that he accused Mr. Chaisson of being drunk and that he said that he was taking Mr. Chaisson back to the office so he could undergo a drug test. Mr. Chaisson denied that David said anything about a drug test. David further claimed that Mr. Chaisson had been drunk since they started working at 5:30 a.m. and that he allowed him to continue working because his father, Andrus, wanted him to work.

Once they arrived back at Pellerin & Sons' office, Mr. Chaisson said that he told David that he quit and that he took off walking down the road. In his deposition, he claimed that his back started hurting as he was walking. However, he testified that his back only started hurting the next day, and he clarified that his back was sore while he was walking. He further testified that he called Ms. Dumesnil the next day to report that his back was hurting. However, he later testified that he did not tell her that his back was hurting. In his deposition, he said that he told her that his back was hurting.

David said that he told Ms. Dumesnil that Mr. Chaisson was drunk and asked her what he should do about it. She confirmed this and stated that she told him to either have Mr. Chaisson take a drug test or to take him home.

17

Mr. Chaisson stated that he told Donald about his alleged accident. Although Donald confirmed this, he claimed that Mr. Chaisson never said that he was under the truck when the incident occurred. Mr. Chaisson further told Donald that David hit him in the face. Donald said that Mr. Chaisson told him that he was hit in the arm. Donald further claimed that Mr. Chaisson told him that he would not submit to a drug test. He further claimed that Mr. Chaisson reeked of alcohol, although he did not claim that he was drunk.

Andrus testified that he wanted Mr. Chaisson to return to work after the incident and that he told his secretary, Ms. Dumesnil to contact Mr. Chaisson. He claimed that she tried to contact Mr. Chaisson four to five times. However, Ms. Dumesnil said that she only spoke to Mr. Chaisson after he called the office to get his pay records. She did not mention anything about Andrus having her contact Mr. Chaisson to have him return to work.

Mr. Chaisson said that he sought unemployment benefits after he quit working for Pellerin & Sons, but that he let the claim go when he learned that he did not qualify for unemployment benefits because he was hurt. However, the unemployment records reveal that on July 17, 2017, he qualified for unemployment benefits because he left his employment for good cause, due to being unsatisfied with his working conditions. This decision was appealed by Pellerin & Sons, and the decision was reversed upon a finding that Mr. Chaisson left work because he refused to take the alcohol test requested by Pellerin & Sons.

In Pellerin & Sons' appeal of the initial unemployment finding, David indicated that Mr. Chaisson arrived at his home on the date of the incident, after which they left for road calls. He then stated, "Later, Supervisor Pellerin noticed Chaisson seemed to be inebriated." However, David was adamant during his testimony that Mr. Chaisson was drunk at 5:30 a.m., when he started work. David

18

claimed that Mr. Chaisson was always drunk on the job, but that he had never been hurt on the job. He further denied in his testimony that he stated, in Pellerin & Sons' appeal to Mr. Chaisson's unemployment claim, that he only noticed that Mr. Chaisson was drunk "later" because he did not want to admit to the Louisiana Workforce Commission that he allowed Mr. Chaisson to work while drunk.

Mr. Chaisson stated that he waited thirty days to seek medical treatment because he was hurt on the job and he felt that Pellerin & Sons was liable for his injury. However, he admitted that he sought medical treatment on many occasions from the University Medical Center.

While the context of the WCJ's oral finding regarding Mr. Chaisson's "complex and extensive history" of back treatment is unclear, as the record does not show any pre-claim treatment for back related injuries, the WCJ was presented with considerable conflicting evidence in this matter. In weighing the credibility of Mr. Chaisson against that of Andrus and David Pellerin, as well as other witnesses, he evidently determined that Mr. Chaisson's credibility was outweighed by that of the Pellerins. Thus, considering the great deference due to a WCJ's findings, when based on a credibility determination, we find no error in the WCJ's finding that Mr. Chaisson failed to prove that he suffered a work-related accident.

### DISPOSITION

For the foregoing reasons, the judgment of the WCJ dismissing Mr. Chaisson's claims against Pellerin & Sons, Inc., with prejudice, is affirmed. The costs of this appeal are assessed against the plaintiff, David Chaisson.

**AFFIRMED.**